## In re GRANT BROADCASTING OF PHILADELPHIA, INC. (Jointly administered with Grant Broadcasting System, Inc., Channel 33, Inc., Grant Broadcasting of Chicago, Inc., and Grant Broadcasting of Chicago Limited Partnership), Debtors.

### Bankruptcy No. 86–05614S.

### United States Bankruptcy Court, E.D. Pennsylvania.

### March 2, 1987.

---

Marc J. Sonnenfeld, Jami Wintz McKeon, Philadelphia, Pa., for debtors.

Nathan B. Feinstein, Lawrence G. McMichael, Philadelphia, Pa., for Secured Noteholders.

Howard Glassman, Leon Forman, Philadelphia, Pa., for Programmers.

Susan L. Thorner, Hughes, Hubbard & Reed, New York City, Doron A. Henkin, Philadelphia, Pa., for Viacom.

Mary Walrath, Philadelphia, Pa., for Creditors' Committee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The instant five (5) jointly administered bankruptcy cases, three (3) of which were filed on December 8, 1986, one of which was filed on December 10, 1986, and the last of which was filed on January 27, 1987, involve the most significant members of the independent television industry, an industry which is experiencing somewhat of a slump after a period of great prosperity, who have attempted to utilize Chapter 11 of the Bankruptcy Code as a means for reorganization and retention of control of their stations.

Undoubtedly because these cases represent a testing of the waters by the three (3) main bodies of interested parties—the Debtors; allegedly secured creditors who are investors in the Debtors who are designated as "the Secured Noteholders;" and unsecured creditors whom the Debtors owe for purchases of programming, who are designated as "the Programmers"—the Debtors have faced stiff opposition on practically their every move since the filing. Thus, we found ourselves immersed in a trial which consumed six (6) trial days between January 9, 1987, and February 3, 1987, representing a consolidated hearing on the Debtors' Motion for Authority to Use Cash Collateral pursuant to 11 U.S.C. § 363, originally presented to the Court on December 12, 1986, and a Motion by the Secured Noteholders for Relief from Stay, to Transfer Control of Subsidiary Debtor Broadcast Stations Scheduling a Public Ju-

dicial Sale of Debtors' Assets, and for Other Relief, originally filed on January 7, 1987. We also took a full day's testimony on February 9, 1987, on a Motion of the Programmers to Compel Assumption or Rejection of Exclusive Licensing Agreements; to Compel Debtors to Make Administrative Payments; for Adequate Protection and Relief from the Automatic Stay, filed January 16, 1987, on which briefing is outstanding. Further, we have taken testimony on four (4) days on an Application by the Debtors for Approval of Settlement Agreement Between Debtors and Viacom International, Inc. (hereinafter referred to as "Viacom"), entered into on January 30, 1987, to resolve Motions (1) "for an Order Directing the Return of Property in Possession of Debtor," and (2) for Relief from the Automatic Stay and for an Order Directing the Return of Property in Possession of Debtor filed by Viacom on December 19, 1986, and January 7, 1987, respectively, and on which we took another day's testimony prior to settlement. Also, a dispute arose between two (2) applicants for counsel to the "Official Creditors' Committee," and this has required testimony and briefing. Nor is the end at hand, because the Programmers, on February 12, 1987, have moved for the appointment of a Trustee, and this is apparently disputed by all other parties. Numerous other sundry minor miscellaneous Motions have also been disposed of by us along the way.

This Opinion addresses only the issues raised in reference to the consolidated hearings on the Debtors' Cash Collateral Motion and the Secured Noteholders' Motion for Relief from Stay. Our factual finding that the value of the stations in question is about $25 million, or twenty-seven (27%) percent, in excess of the extent of the Secured Noteholders' security interests and our willingness to give what appeared to be an outstanding management team of the Debtors an opportunity to regroup themselves armed with the benefits of Chapter 11 of the Code result in our granting the Debtors' Motion and denying the Secured Noteholders' Motion. However, the lack of firmness of the Debtors' financial status, and hence their outlook for reorganization,

in the face of what appears to be opposition from all quarters causes us to condition our conclusions temporally (the Order shall remain in effect until only July 1, 1987 (approximately one hundred and twenty (120) days)); and with requirements that the Debtors formulate a Plan and accomplish their proposed Cash Flow Projections and the cuts in programming costs which their expert assumed in giving his valuation testimony within the same time frame; that the Secured Noteholders' delegate continue to receive access to all financial information of the Debtors in order that he can monitor the Debtors on behalf of his clients; and that the Secured Noteholders continue to be accorded a super-priority status on any use of cash collateral which diminishes their security interests in the Debtors' property.

Since testimony on the instant Motions has been been adduced almost from the onset of the filing of these cases, our statement of the case before us will be short on procedural history and long on factual findings.

The Debtors' Cash Collateral Motion was first brought before us on December 12, 1986, while we were temporarily sitting in the Court's Reading station. On that day, after a telephone conference call with counsel representing the Secured Noteholders and the Programmers in California, and with the agreement of such counsel, we entered, with some revisions, proposed Orders of December 12, 1986, authorizing the Debtors to use cash collateral assets and pre-petition bank accounts through December 19, 1986, when a further hearing was scheduled. On December 19, 1986, the parties, with the Secured Noteholders and the Programmers now represented by Local Counsel presented a Stipulated Order which allowed the Debtors to continue to utilize cash collateral until January 9, 1987, with the added proviso that the Debtors supply certain financial reports and a list of executory contracts to counsel for the Secured Noteholders.

On December 19, 1986, the parties advised us that a contested cash collateral hearing might not be necessary. However,

by January 9, 1987, it was apparent that not only had no agreement been reached, but it was likely that the extended proceedings which ultimately came to pass on this issue would be necessary. Therefore, near the end of the day on January 9, 1987, the Court and counsel met in chambers and fashioned a more permanent Stipulated Order, authorizing the Debtor to use cash and accounts receivable pending the outcome of the hearing. In this Order, the Secured Noteholders specifically designated Harold A. Christiansen, until recently vice-president in charge of television station operations of a broadcasting system far larger than the Debtor, Metromedia, Inc., as their recipient of all financial reports from the Debtors and "monitoring agent." The Secured Noteholders were also accorded superpriority status, per 11 U.S.C. §§ 507(b) and 503(b)(1), to the extent that their property interests were diminished by the Debtor's use of cash collateral.

Throughout the course of the hearings and at the close of the testimony, on February 4, 1987, the Court entered a series of Orders continuing the effect of the Stipulated Order of January 9, 1987. In the final Order, the automatic stay was expressly kept in place pending the Court's ultimate decision on the merits. The wording of the Order of February 4, 1987, was altered slightly by agreement of the parties on February 9, 1987.

The parties were accorded the opportunity to submit Briefs on the instant Motions on or before January 29, 1987, when we believed that we were nearing the end of the proceedings, and they were subsequently accorded the opportunity to also submit Proposed Findings of Fact, Conclusions of Law, and any supplemental Briefs on or before February 13, 1987. The matter was submitted to the Court in a stimulating one-hour oral argument conducted at the end of a day of hearing on the Viacom Settlement Agreement Motion on February 17, 1987. We are aided substantially by the submissions of learned counsel in the formulation of the Findings of Fact and Conclusions of Law which we adopt as our own.

## B. FINDINGS OF FACT

1. The Debtors are (a) Grant Broadcasting of Philadelphia, Inc. (hereinafter referred to as "Grant/Phila."); (b) Channel 33, Inc. (hereinafter referred to as "Grant/Miami"); (c) Grant Broadcasting of Chicago, Inc. (hereinafter referred to as "Grant/Chicago"); (d) Grant Broadcasting of Chicago Limited Partnership (hereinafter referred to as "the Partnership"); and the parent of the foregoing, (e) Grant Broadcasting System, Inc. (hereinafter referred to as "GBSI").

2. Grant/Phila. owns and operates Channel 57, WGBS–TV, in Philadelphia. Grant/Miami owns and operates Channel 33, WBFS–TV, in Miami. Grant/Chicago is the general partner of the Partnership, the latter of which owns Channel 66, WGBO–TV, in Chicago; Grant/Chicago operates this station.

3. Channel 57, Channel 66 and Channel 33 are each independent UHF television stations, i.e., they are not affiliated with any larger network. Channel 33 began broadcasting in December, 1984; Channel 57 on October 10, 1985; and Channel 66 began broadcasting as a Grant Company on January 4, 1986.

4. Milton Grant is the President and Chief Executive Officer of GBSI.

5. After a long career in different aspects of the broadcast industry, Mr. Grant led a group which purchased an independent UHF station in Dallas, Texas, in 1981, and shortly thereafter, a station in Houston, Texas, for a total price of approximately $15 million. In early 1985, these stations were sold for approximately $175 million, resulting in a short-term profit of approximately $160 million.

6. During the period in which the Texas stations were bought and sold, the independent television industry was generally doing extremely well.

7. Much of the success of the Grant operations which was unparalleled even given the favorable climate for such stations, was attributable to the very aggressive activities of these operations in ac-

quiring programming. This strategy was, at the time, innovative in the industry, and it resulted in the Grant stations' being able to quickly develop high ratings and generate considerable advertising revenue, and hence rapidly enhance the value of these stations.

8. Several key employees who had been part of the Grant operations in Texas joined GBSI and/or its subsidiaries when they were formed in 1985 and 1986.

9. Optimistic that they would duplicate, with GBSI, the same success that they had achieved in Texas, Grant and the other principal of the Debtors, Sidney Shlenker, and a group of investors associated with them, contributed a total of $15 million to the GBSI operation, of which $2.6 million was the personal investment of Mr. Grant.

10. Needing additional capital to purchase and set up these television stations, GBSI, in a private placement, issued certain bonds for aggregate gross proceeds of approximately $80 million discounted, which bonds stated that they granted to their holders a security interest in the assets of GBSI.

11. The Secured Noteholders are the holders of these bonds. There are three (3) types of bonds issued: $30 million in face amount of Senior Notes maturing June 15, 1991; $81 million in face amount of Senior Subordinated Notes, maturing December 15, 1991; and $58.5 million in face amount of Subordinated Notes, maturing December 15, 1992.

12. The three (3) subsidiary debtors guaranteed the obligations of GBSI with respect to the notes and granted to the Secured Noteholders a security interest in the assets of each of them.

13. Of the proceeds received from the bond issuance, approximately $35 million was contributed or lent by GBSI to Grant/Phila. to purchase Channel 57; approximately $20 million was advanced or lent by GBSI to Grant/Miami to purchase Channel 33; and approximately $16 million was either lent to Grant/Chicago or lent to the other partners in the partnership to purchase Channel 66.

14. The purchase prices paid for the three (3) stations were approximately the same as the proceeds received from the bond issuance.

15. The indebtedness to the Secured Noteholders at the time the Petitions were filed totals $90,950,174, not including subsequently accruing interest. The amount of the indebtedness among the three (3) classes of Secured Noteholders is as follows:

| (a) | Senior Second Lien Notes | $32,102,500 |
| (b) | Senior Subordinated Zero Coupon Notes | 35,285,008 |
| (c) | Subordinated Zero Coupon Notes | 23,142,666 |
| | TOTAL | $90,530,174 |

16. Interest on the Senior Notes is at a predefault rate of 14.5 percent per annum (approximately $5 million per annum) and at a postdefault rate of 14.5 percent per annum, compounded semi-annually (approximately $5.3 million).

17. The Senior Subordinated Notes and the Subordinated Notes do not provide for predefault interest, interest not being due, unless there is a default, until the date of maturity.

18. The post-default rates on the Senior Subordinated Notes are 17.25 percent per annum (almost $4 million per annum) and accrue at a post-default interest rate of 17.25 percent per annum, compounded semi-annually (about $4.2 million per annum). The post-default rates on the Subordinated Notes are 16 percent per annum (about $5.1 million per annum) and post-default interest accrues at a rate of 16 percent per annum, compounded semi-annually (over $5.3 million per annum).

19. The security interests securing the three (3) classes of notes held by the Secured Noteholders were originally intended to be second, third and fourth liens on all of the Debtors' assets, in order to reserve a first lien to secure a line of credit, anticipated to be $31 million, from the Allied Bank of Texas.

20. Despite efforts by the Debtors to obtain same, depression in the independent television industry in 1986 and less than

the anticipated financial performance of the Debtor-stations, caused the Debtors to fail in acquiring this line of credit to date. Mr. Grant testified that it was this failure, and the cash flow problems arising therefrom, which caused the Debtors to resort to bankruptcy.

21. Since the line of credit from Allied Bank of Texas to the Debtors does not currently exist, the liens securing the indebtedness to the Secured Noteholders are now, if valid, first, second and third liens respectively.

22. The trust indentures for each class of notes held by the Secured Noteholders provide that a default occurs, *inter alia:*

(a) with respect to the Senior Notes, if the company fails to pay interest when due or if the company fails to obtain a loan from Allied Bank of Texas;

(b) with respect to the Senior Subordinated Notes, if there is a default under another indenture or if the company fails to obtain a loan from Allied Bank of Texas;

(c) with respect to the Subordinated Notes, if there is a default under another indenture or if the company fails to obtain a loan from Allied Bank of Texas; and

(d) with respect to all of the Notes, if the company commences any proceeding in bankruptcy.

23. Interest due on all of the Notes was paid by the Debtors prior to their filings. However, interest due to be paid on the Senior Notes on December 15, 1986, was not paid. Also as indicated at paragraph 21 *supra,* the loan from Allied Bank of Texas has never obtained by the Debtors to date.

24. While the Secured Noteholders contend that the events set forth in paragraph 22 *supra* constitute a default, the Secured Noteholders never declared any default prior to the bankruptcy filing.

25. The Debtors' expert witness, Bruce Bishop Cheen, stated, in testimony which was not contested, that 1986 was a extremely difficult year for the independent television industry, because it was the slump year in a 4–year cycle characteristic of the industry, exacerbated by unfavorable market forces such as decreased advertising revenue and increased competition for such revenue from the print industry. Also, 1986 was characterized by a softening in inflation, resulting in reduced advertising and television advertising revenues; a further softening in the advertising and television advertising media caused by the problems being experienced in the energy industry; and a softening in the toy business (which is of particular significance to independent stations because of their heavy reliance on children's programming, customarily funded by advertising revenues from toy manufacturers).

26. In addition, due to conditions created in part by the aggressive purchase of programming by the Grant stations in the Texas markets, which certain other stations in competition and in emulation of the Grant stations had utilized, programming costs have dramatically increased.

27. Due to the foregoing conditions, the Debtors suffered considerably greater losses during 1986 than they had projected. While there was a projected loss of $20 million, the actual losses by the Debtors in 1986 were approximately $36 million.

28. The Debtors agree that they must reduce their operating costs if they are going to be able to reduce the increment of the losses, and they believe that, by the use of their power, in bankruptcy, to reject or accept certain programming contracts, as well as other belt-tightening measures, they will be able to achieve this result. It does appear, however, that the Programmers, largely based on a fear that compromises with the Debtors will encourage similar actions or threats of such actions by other independent stations which are experiencing financial difficulties, will stiffly resist efforts by the Debtors to cut costs in this area.

29. Mr. Cheen testified that a reduction in operating expenses may be achieved by various forms of negotiation with programmers, all of which he believed were possible.

30. Mr. Grant testified that the Debtors' objective is to reduce programming

expenses by 50 percent. The Debtors have negotiated a Settlement Agreement with Viacom, which the Debtors' officers testified is the most significant supplier of the programming of the Debtor stations. This Settlement Agreement was approved by Order of this Court on February 26, 1987, and is addressed in another Opinion filed in this case on this date. We find that consummation of this Settlement Agreement will be a building block in negotiating with other programmers.

31. Since the filing of these petitions, the Debtors have cut their operating expenses by 18 percent and laid off 26.5 employees. Operating costs for Grant/Phila. have been decreased by 10.5 percent; operating costs for Grant/Miami have been reduced by 13.27 percent; and operating costs for Grant/Chicago have been reduced by 28 percent.

32. Having observed numerous members of the Debtors' management team in the course of this and the related hearings, the Court has been extremely impressed by the candor, high morale, and the apparent high level of ability of these individuals, from Mr. Grant down to the individual station managers. While there have been allegations that the Debtors have not been cooperative in supplying financial data to Mr. Christiansen and counsel for the Secured Noteholdes, we believe that any deficiencies have resulted from the severe disruption to the Debtors' operations caused by the need to be present and observe numerous days of testimony in these proceedings, the fact that the Debtors' newness and small size does not allow for swift accommodation of all of the requests made, and communications problems between the Debtors' management and Mr. Christiansen and their respective counsel.

33. While certain of the Debtors' management practices, particularly their extreme aggressiveness in purchasing programming, was criticized by Mr. Christiansen, we believe this to be a philosophical difference arising partly from Mr. Chrstiansen's experience in a larger, more conservative managerial environment. The overall professionalism and vigor of the Debtors' personnel was commended by Mr. Christiansen.

34. As a result of the foregoing, we find that the capabilities and likelihood of the Debtors to manage these stations and to perform their financial projections is good, and that they will be very likely to comply with directives of this Court to supply information to all other interested parties, including the Secured Noteholders and Mr. Christiansen.

35. Both the Debtors and the Secured Noteholders called impressive expert witnesses to testify regarding the present value of the Debtor stations. The Debtors called Bruce Bishop Cheen, a very lucid individual who is employed as a consultant by PK Associates, which is an independent research analyst of the broadcast industry. Mr. Cheen presented a clear and cogent prospective of the immediate past and present independent television network scene, as well as his valuative analyses of the Debtor stations. The Secured Noteholders presented Anthony Hoffman, an extremely competent investment banking specialist in the broadcast industry employed by Union Bank of Los Angeles to advise it in making investments in this field. Both expert witnesses were extremely impressive in their independence, candor, and ability to explain difficult concepts.

36. Utilizing the "multiple of cash flow method" of evaluating broadcast stations, (which requires a determination of the operating income of the stations, i.e., earnings before depreciation, amortization, interest and taxes, and a division of the purchase price of the stations by the operating income) and assuming that the Debtors would achieve a twenty-five (25%) percent reduction in programming expenses, Mr. Cheen "conservatively" estimated the fair market values of the Philadelphia, Miami, and Chicago stations at $57.09 million, $37.4 million, and $20.98 million, respectively, or at a total of $115,479,000.

37. Mr. Hoffman, meanwhile, based his opinion of the value of the subsidiary broadcast stations solely on data from sales of selected allegedly comparable sta-

tions between May, 1983, and April, 1985. Mr. Hoffman picked what he believed were comparable sales based upon signal strength of the station, audience share, rank among independents in the market area, and the overall competitive environment of the market area as indicated by the number of television stations present. However, this resulted in his utilization of only ten (10) sales in a period removed from the present by two to four years as the basis for his entire analysis. This analysis resulted in a conclusion that the present value of the subsidiary broadcast stations is $90,530,000. However, Mr. Hoffman suggested that a downward trend in the market for such stations justified a ten (10%) percent decrease, and hence he stated that the "range" of value would be between $81,477,000 and $90,530,000.

38. Both Messrs. Cheen and Hoffman stated that the "multiple cash flow method" is the method most frequently used in the broadcast industry to determine the value of stations.

39. Given that he used the most frequently-used valuation method and his assumption that the Debtors will reduce programming costs by twenty-five (25) percent seems likely to transpire, the Court accepts the conclusion of Mr. Cheen that the value of the stations at present is in fact $115,479,000, and so finds. We believe that Mr. Hoffman's methodology is not that regularly used in the industry, and hence should not be utilized here, and we are not convinced that the stations selected by Mr. Hoffman as comparable may have supplied sufficient data or recent enough data to establish that his estimates are valid, assuming *arguendo* that the comparable sales method was the proper method to be utilized. We also find that Mr. Hoffman's explanation as to how he chose "comparable" stations was less than convincing that the sales that he utilized represented a complete and hence accurate basis of comparison to the instant stations from the universe of all sales of independent television stations since 1983.

## C. CONCLUSIONS OF LAW

1. The Secured Noteholders had, at the time of filing, an "equity cushion" of approximately $25 million, or over twenty seven and a half (27½%) percent of their investment, at the time of filing, of approximately $90.5 million.

2. We believe that this equity cushion will increase rather than erode in the future, especially since we find that the Secured Noteholders have failed to meet their burden of proving that the extent of their security interest includes interest computed at post-default rates as opposed to pre-default rates.

3. The existence of an equity cushion of the magnitude present here, which is likely to increase in size, especially since it is combined with the presence of a strong likelihood that the Debtors will be able to successfully reorganize under Chapter 11, constitutes adequate protection to the interests of the Secured Noteholders per 11 U.S.C. § 361, for purposes of 11 U.S.C. §§ 363(c)(2) and 362(d)(1). The presence of an equity cushion also negates the applicability of 11 U.S.C. § 362(d)(2), per § 362(d)(2)(A).

4. Because of the uncertain future of the independent television industry, and because there is necessarily some question as to whether the Debtors will be able to successfully perform as they plan and hence successfully reorganize, the following conditions must be imposed upon the Debtors:

a. The use of cash collateral shall be authorized for a period of only approximately an additional 120 days.

b. All of the conditions established in the Stipulated Order of January 9, 1987, shall remain in effect.

c. The Debtors shall be required to produce at least a tentative Plan, and shall additionally be required to show, at a hearing to be held in approximately 120 days to determine whether further use of cash collateral is warranted, that they are operating within the Cash Flow Projections entered into evidence in this case (Exhibits "D-3," "D-4," and "D-5") and whether

they have achieved at least the twenty-five (25%) percent reduction in programming costs which were assumed by Mr. Cheen in his valuative process.

5. With these conditions in place, the Debtor is entitled to use cash collateral.

6. The Secured Noteholders are not entitled to relief from the automatic stay, or any of the other relief which they seek in their Motion, at this time.

## D. DISCUSSION

The Motion of the Debtors for permission to use cash collateral is made pursuant to 11 U.S.C. §§ 363(c)(1), and (c)(2) and (e) which provides as follows:

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section....

.    .    .    .    .

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

The Secured Noteholders' Motion is based upon 11 U.S.C. § 362(d), which provides as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Central to the resolution of both Motions is the determination of whether the Secured Noteholders' interests are adequately protected. If the interests of the Secured Noteholders are not adequately protected, then § 363(e) prohibits the Debtors from using cash collateral unless, per § 363(c)(2)(A), the Secured Noteholders consent thereto, which, here, they assuredly do not. Conversely, if the Secured Noteholders' interests are not adequately protected, not only may they successfully object to the Debtors' use of cash collateral, but they may further be able to obtain relief from the automatic stay to pursue whatever contractual state law remedies exist, including recovery of their collateral, per 11 U.S.C. § 362(d)(1).

Both sections 362 and 363 are preceded by 11 U.S.C. § 361, which states the following concerning the concept of "adequate protection," as applied to the immediately-succeeding statutory sections:

Sec. 361. Adequate protection.

When adequate protection is required under section 362, 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

Both Section 362 and 363 have provisions which address the subject of the burden of proof of the competing parties in Motions under these respective sections, as follows:

§ 362

(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

§ 363

(o) In any hearing under this section—

(1) the trustee has the burden of proof on the issue of adequate protection; and

(2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

Taking these two sections together, it can be concluded that, in a § 363(c)(2) hearing, the Debtor has the burden of proof on all issues except the validity, priority, and extent of the alleged secured party's security interest, including all other component elements relevant to the "issue of adequate protection." In a § 362(d) hearing, the debtor has the burden of proof on all issues except the issue of his equity in the property.

In *In re Stranahan Gear Co.*, 67 B.R. 834, 836–38 (Bankr.E.D.Pa.1986), we addressed the issue of burden of proof per §§ 362(d), (g) and concluded that, despite the language of § 362(g)(2), the moving creditor has an initial burden of showing prima facie "cause" for relief before any burden attaches to the Debtor.

In analysis of § 363(o), we would be inclined to allocate the burdens in a different fashion than we did in analyzing § 362(g). In invoking § 363, the debtor is seeking to alter the status quo that he cannot utilize cash collateral, whereas, in a § 362(d) hearing, it is the creditor who is seeking to alter the status quo of the sweeping protection of the debtor by the automatic stay.

The upshot of the foregoing is our conclusion that the burden of the Debtor is stiffer on a § 363 Motion than it is in withstanding the Motion of a creditor on a § 362 Motion. Thus, if the Debtor is able to satisfy us that the creditor is adequately protected for purposes of § 363(c)(2), then it seems to us that, at least as to that creditor, he will satisfy us as to § 362(d) also. Hence, if we conclude that the Debtors here have met their necessary burdens per § 363(c)(2), they will be found to have met them for purposes of § 362(d)(1) as well.

A threshold issue raised by the other creditors, if anything even more vigorously than the Debtors, is the issue of the "validity, priority, or extent" of the Secured Noteholders' security interests. This is based on the allegations fleshed out by the Programmers in their Motion for Appointment of a Trustee, that the financing arrangement here was akin to a "leveraged buyout." *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1292 (3d Cir. 1986); *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 791–94 (2d Cir. 1981); and R. Rosenberg, *Intercorporate Guaranties and the Law of Fraudulent Conveyances: Lender Beware*, 125 U.PA. L.REV. 235 (1976). However, although those concepts have been bandied about and we believe that the Secured Noteholders have to make a *prima facie* showing of the validity of their security interests, if no other party seriously questions same by evidence placed on the record, they must be deemed valid. Without expressing any opinion as to the conclusion that we might reach on a fuller record, for the purposes of deciding the instant Motions, we con-

clude that the Secured Noteholders have adequately met their burden of showing the priority and the validity of their liens, and that their liens are extended to interest at the pre-default rates stated therein.

■ We therefore conclude, for purposes of these proceedings, that the Secured Noteholders have met their burden of establishing that their liens are valid to the extent of $90,530,174, and that they have established that pre-default interest of approximately $5 million per annum will accrue. However, we do not believe that the Secured Noteholders have met their burden of establishing that their security interests extend to a right to post-default interest, which would accrue at the rate of approximately $15 million per annum. At no time pre-petition did the Secured Noteholders declare a default by the Debtors, as we believe that Section 3.03 of the securities requires, and the automatic stay has been in place to prevent them from doing so post-petition. Further, there is considerable doubt whether any of the Events of Default set forth in Section 4 of the securities occurred pre-petition except the *ipso facto* bankruptcy-filing clause which, as one of the competing Creditors' Committees points out, is unenforceable. *See e.g., In re Bryant,* 43 B.R. 189, 195 (Bankr.E.D. Mich.1984); and *In re Rose,* 21 B.R. 272, 275–76 (Bankr.D.N.J.1982). All payments of interest were made pre-petition. As the Creditors' Committee referred to *supra* further argued, there is no time limit set forth in the documents by which the Debtors must obtain the line of credit from the Allied Bank of Texas. We are not prepared to hold that a failure to do so for only several months constitutes a violation of this condition. Therefore, we hold that the Secured Noteholders' interests will accrue, at this point, at the rate of $5 million per annum.

■ The Debtors have the burden on all other issues, i.e., establishing that the aforesaid security interest of the Secured Noteholders will be adequately protected. The strategy of the Debtors, which has, by at least implication, been questioned by the unsecured creditors, including the Pro-

grammers, is to contend that there is a sufficient "equity cushion" to secure the interests of the Secured Noteholders.

There appears to be no dispute among the parties that an "equity cushion," if sufficient in size and unlikelihood of erosion, may constitute, in itself, adequate protection. *See, e.g., In re Mellor,* 734 F.2d 1396, 1400 (9th Cir.1984); *Commonwealth of Pennsylvania State Employees Retirement Fund v. Roane,* 14 B.R. 542, 544–45 (E.D.Pa.1981) (per BECHTLE, J.); *In re Liona Corp.,* 68 B.R. 761, 767 (Bankr.E.D. Pa.1987); and *In re Curtis,* 9 B.R. 110, 112 (Bankr.E.D.Pa.1981). In light of our factual finding that the Debtor television stations are worth about $115.5 million and that the Secured Noteholders' security interests are in the amount of but $90.5, we must conclude that there is a substantial equity cushion, of approximately $25 million and over twenty-seven (27.5%) percent at present.

Moreover, as per our previous conclusion that the Secured Noteholders have only met their burden of showing that their interests will accrue at approximately $5 million per annum, it seems very likely that the equity cushion will increase rather than decrease over the passage of time. What is in issue here is an asset which, in the right hands and under the right circumstances, will appreciate far more quickly than the real estate in issue in the cases cited in the preceding paragraph, or the farm livestock and crops in issue in such cases as *In re Vanas,* 50 B.R. 988 (Bankr. E.D.Mich.1985); and *In re Stein,* 19 B.R. 458 (Bankr.E.D.Pa.1982). The stations in issue here were acquired at respective costs of approximately $35 million (Philadelphia), $20 million (Miami), and $16 million (Chicago). In about two (2) years, the value of the Miami station, per Mr. Cheen, increased to $37.4 million. In about one (1) year, again per Mr. Cheen, whose evaluations we credit, the value of the Philadelphia and Chicago stations have increased, respectively, to $57.09 million and $20.98 million. This represents a value increase of about $35 million for all three (3) stations per annum. We might add that even

the low estimates of Mr. Hoffman, which evaluated the stations at about $81.5 million, indicated an appreciation, in the worst of times (1986), of over $7.5 million per year.

We are therefore unable to reach any conclusion except that the equity cushion of the Secured Noteholders is very likely to increase.

Despite the foregoing conclusions, we are not required here to conclude that an adequate and likely-to-be-expanding equity cushion, without more, constitutes adequate protection. Rather, we are presented with Debtors who are not only fully intending to remain in business, but are doing so with a vigor and vitality which convinces us that they have a substantial probability of success, even in the face of spirited opposition from several different sources and on several fronts simultaneously. We believe that the opportunity to reject or accept certain programming contracts, which our approval of the Viacom Settlement Agreement will allow the Debtors to begin in earnest, will be a substantial catalyst to the prospect of the Debtors' recovery. The management team of the Debtors seems quite prepared to leave behind their disappointment that the Debtors have failed to approach the tremendous success of the Grant stations in Texas and achieve what they can given the present depressed state of their industry. Of course, faith in an ability to do so and accomplishment are two completely different matters, and we can certainly conceive of a scenario where the Debtors could, by any terms, be deemed to have failed. However, it is rare that accomplishment is attained without faith in an ability to do so and the requisite faith is clearly present. Moreover, it is faith which has already been acted upon through belt-tightening in each of the Debtor stations, and projections which appear to at least have the possibility of success.

Therefore, we believe that what is before us are Debtors who are capable of effecting a successful reorganization. In a scenario where this element is lacking, an absence of adequate protection can far more readily be found. *Compare In re Diaconx Corp., Hamilton Bank v. Diaconx Corp.*, 69 B.R. 333, 335–40 (Bankr.E.D.Pa.1987) (Debtor not operating business any longer). We are especially unwilling, at this very early stage in the case, to draw the curtain down on the Debtors. *See, e.g., In re 6200 Ridge Inc.*, 69 B.R. 837, 843 (Bankr.E.D.Pa.1987); *In re Dore & Assoc. Contracting Inc.*, 54 B.R. 353, 359–60 (Bankr.W.D.Wis.1985); *Vanas, supra*, 50 B.R. at 1001; and *In re Koopmans*, 22 B.R. 395, 404 n. 17 (Bankr.D.Utah 1982). That is what we would be effectively doing if we granted not only the rather extraordinary relief sought by the Secured Noteholders of scheduling a sale of the stations, but even if we denied the Debtors access to use of cash collateral which they obviously need to stay afloat.

Our foregoing conclusions are sufficient to resolve what is immediately before us. We believe that the Debtors have made a rather strong showing of a sufficient equity cushion and a prospect for successful Chapter 11 reorganization that we conclude, without hesitancy, that they have met their burden of proving that the Secured Noteholders will be adequately protected such that we will grant their cash collateral Motion and deny the Secured Noteholders' Motion under § 362(d)(1). Having found both an existing equity and a necessity for the Debtors to retain their secured assets to effectively organize, we find that neither prong of § 362(d)(2) is present. We will, however, impose certain conditions on the Debtors, as is indicated below, because we recognize that a good deal of speculation is contained in our findings and we do not wish to allow the Debtors to continue to lose millions of dollars on mere faith and hopes that become impossible to realize.

Because of our finding that the Secured Noteholders here are quite adequately oversecured, we could conceivably avoid reaching the issue of what the result of these Motions would be if we found the Secured Noteholders to have been undersecured. However, we do note that the Debtors have raised, as an alternative argu-

ment, that the Secured Noteholders are adequately protected irrespective of whether they are oversecured or undersecured; the Programmers vigorously argued on this basis alone; and the Secured Noteholders have just as vigorously argued to the contrary. We therefore believe that we should proceed to hold, as an alternative ground for decision, that, even if the Debtors could be found to have failed to make a showing that the Secured Noteholders were oversecured, and even if they had been unable to show that the Secured Noteholders had an adequate "equity cushion," the Debtors would have been, in our view, entitled to prevail on the Motions before us.

■ While the necessity to issue this decision promptly causes us to abbreviate full explanation of our reasoning process, we must express our view that *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984), and the cases which follow it, most notably *Grundy Nat'l Bank v. Tandem Mining Corp.*, 754 F.2d 1436 (4th Cir.1985); and *In re Monroe Park*, 17 B.R. 934 (D.Del.1982), were incorrectly decided insofar as they hold that, in determining whether an undersecured creditor is adequately protected, such a creditor is always entitled to receive compensation "for the delay in enforcing ... rights during the interim between the petition and confirmation of the plan." 734 F.2d at 435. Rather, we agree in large part with the result reached by the Fifth Circuit, adopted by the Court en banc, in *In re Timbers of Inwood Forest Associates, Inc.*, 793 F.2d 1380, 1416 (5th Cir.1986), *reinstated*, 808 F.2d 363 (5th Cir.1987) (en banc), that such compensation should not always be a factor in determining whether a creditor is adequately protected. *Accord, e.g.: In re Island Helicopter Corp.*, 63 B.R. 809 (Bankr. E.D.N.Y.1986); *In re Pine Lake Village Apt. Co.*, 19 B.R. 819 (Bankr.S.D.N.Y. 1982); and *In re Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr.D.Utah 1981).

The Secured Noteholders suggest that this Court decided this issue consistently with the *American Mariner* line of cases in *In re Nesmith*, 57 B.R. 348 (Bankr.E.D. Pa.1986). While it is true that, in deciding

*Nesmith*, Judge Goldhaber indicates, in the decision, that he "draws succor" from *American Mariner*, *id.* at 349, the issue of whether interest should be collectible on mortgage arrears involves interpretation of Code sections other than § 361. Furthermore, both of the judges presently sitting in Philadelphia have rejected the reasoning of *Nesmith*. *See In re Fries*, 68 B.R. 676, 681–82 (Bankr.E.D.Pa.1986) (per FOX, J.); and *In re Small*, 65 B.R. 686 (Bankr.E.D. Pa.1986) (per SCHOLL, J.). It is, moreover, our view that post-petition interest is collectible by creditors in only certain circumscribed situations. *Cf. Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946); and *In re Shaffer Furniture Co.*, 68 B.R. 827, 830 (Bankr.E.D.Pa. 1987) (unsecured creditors entitled to post-petition interest only where the Debtor is solvent and equitable considerations favor this result).

We believe that it is far more significant in the weight of considerations as to whether a creditor is "adequately protected" to analyze the Debtor's prospects for a successful reorganization in Chapter 11. If these prospects are strong, as we believe them to be here, then the measure of the secured creditor's adequate protection is the probability that the debtor will be able to propose an effective Plan. The one aspect that troubles us in the *Timbers* decision is the linedrawing as to how a creditor's adequacy of protection is viewed depending upon whether the creditor is oversecured or undersecured. It seems to us anomalous to treat a slightly oversecured creditor, whose security can conceivably bear the brunt of some erosion, completely differently from a slightly undersecured creditor. Without wishing to totally embrace the "free for all" concepts expressed in *In re Briggs Trans. Co.*, 780 F.2d 1339 (8th Cir.1985), we believe that a more significant focus is upon the *degree* that the creditor is oversecured or undersecured viewed in light of the debtor's prospects of reorganization in Chapter 11 in determining to what given performance by the debtor a creditor is entitled to adequately protect its security interests. Thus, if a debt-

or proposes a workable Plan at any early stage in the case and performs in accordance with the terms of the Plan, we do not see any basis in the Code or logic for the debtor to make payments to the undersecured (or even a slightly oversecured) creditor on account of the creditor's delay in collection of interest pending confirmation of the Plan or the costs which the creditor must bear if the reorganization is unsuccessful and he is compelled to foreclose. Rather, we believe that it is incumbent upon us only to monitor the progress of the debtor towards reorganization very carefully if the loss of a creditor's security is potentially at stake.

Thus, here, where the case is at an early stage, the vital signs of the Debtor are good, and a Plan of reorganization appears more than a wishful thought, we would grant the Debtor's Cash Collateral Motion and deny the Secured Noteholders' § 362 Motion even if we totally accepted the value of the stations as opined by Mr. Hoffman and concluded that the Secured Noteholders were undersecured.

On the other hand, while it is apparent that the value of the stations in issue has a stronger possibility of significant appreciation than most realty or farm animals and produce, which are the types of property which seem to most typically be at issue in the reported cases, it is probably also true that there is a stronger possibility of depreciation of the assets in issue here than those in issue in a more stable and traditional industry such as renting realty or farming. Therefore, we are tempering our Order with conditions which will allow recourse to the Secured Noteholders if a dramatic series of reversals, contrary to our admittedly tentative positive diagnosis, transpires. We are therefore limiting the period over which the Debtor can use cash collateral without returning to this Court for a further Order to approximately 120 days. *Compare In re Xinde Int'l, Inc.*, 13 B.R. 212, 215 (Bankr.D.Mass.1981) (Debtor showing marginal profit limited to use of cash collateral for 90 days). We are also continuing in place the monitoring system created in the Stipulated Order of January 9, 1987, by requiring the Debtors to continue to share their financial reports with Mr. Christiansen. We are also continuing all other aspects of the January 9, 1987, Stipulated Order, including the allowance of a super-priority claim to the Secured Noteholders, pursuant to 11 U.S.C. §§ 503(b)(1) and 507(b), for any use by the Debtors of cash collateral which diminishes the Secured Noteholder's interests. Finally, we are adding the conditions that the Debtor stations must produce, as best they are able given the potential of lack of cooperation from all major creditors except Viacom, a tentative Plan and are requiring them to establish, within 120 days, that they are performing per their Cash Flow Projections and are achieving the goal of a twenty-five (25%) percent reduction in programming costs which was the underlying assumption of Mr. Cheen in his crucial evaluation. *Compare Bankwest, N.A. v. Todd*, 49 B.R. 633, 634–35, 636 (D.S.D.1985) (use of cash collateral on conditions of allowing secured creditor to have full financial disclosure, to operate within a given budget, and to give bank a lien on bank accounts approved).

With these caveats, we therefore launch the Debtors on their maiden voyage over untested and obviously troubled waters, without adding to their burdens the albatross of the result in *American Mariner.* An Order consistent with the foregoing will be entered.

### ORDER

AND NOW, this 2nd day of March, 1987, after consideration of (1) the Motion by the holders of Secured Notes of Debtor Grant Broadcasting System, Inc. (the "Secured Noteholders") for Relief from Stay Immediate Assumption of Control, Scheduling of a Public Judicial Sale of Debtor's Assets, and For Other Relief, and (2) the Motion of the Debtors for Authority to Use Cash Collateral Pursuant to 11 U.S.C. Section 363 and, after hearing on same on January 9, January 23, January 26, January 30, February, 2, and February 3, 1987, and upon the consideration of the testimony adduced and Proposed Findings of Fact, Conclusions of Law, and Briefs submitted

by the interested parties and oral argument by all interested parties on February 17, 1987, it is hereby

ORDERED AND DECREED as follows:

1. The Secured Noteholders' Motion is DENIED.

2. The Debtors' Motion is GRANTED, subject to the following conditions:

a. The Debtors are authorized to utilize cash and accounts receivable only to pay the salaries and other necessary operating expenses incurred in the ordinary course of business and required to maintain the operations of Channel 33, Inc., Grant Broadcasting of Chicago, Inc. and Grant Broadcasting of Philadelphia, Inc. Grant Broadcasting System, Inc. is authorized to use such cash collateral only as directly pertaining to or supporting the operations of the three (3) Debtors described in the preceding sentence.

b. No payments whatever are to be made out of the cash collateral or any other assets available to the Debtors in consequence of salaries or compensation of any kind to Milton Grant or any member of the Grant/Shlenker Group, or to any counsel or similar professional group, pending further Order of Court.

c. The Noteholders' designee, Harold A. Christiansen, shall have the right to monitor operations of the Debtors and, in this capacity, he shall be given all reasonable access to management personnel at the subsidiary television stations and the parent Grant Broadcasting System, Inc. He shall be provided with all financial reports, analyses and other similar data, including daily cash reports and weekly receivable reports and other reports on operations, which are made available to management personnel of the Debtors.

d. The Debtors shall pay all tax liabilities as they become due and payable.

e. To the extent that the value of the Secured Noteholders' interest in the property of any Debtor is dimished as a result of the use by such Debtor of cash collateral, the Noteholders shall have against such Debtor a claim with respect to such diminution of the type referred to in Section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

f. The Debtors shall prepare and file a proposed Plan of reorganization on or before June 26, 1987.

g. The Debtor stations shall effect reasonable compliance with the Cash Flow Projections on the documents admitted in evidence as Exhibits "D-3," "D-4," and "D-5" in these proceedings, and the twenty-five (25%) percent reduction in programming costs upon which the valuation estimates of their expert witness, Bruce Bishop Cheen, were computed.

3. The provisions of paragraph two (2) of this Order and any rights granted or obligations imposed pursuant hereto shall only be effective through and until July 1, 1987, except where otherwise indicated. At that time a hearing on the issue of the Debtor's compliance with the conditions set forth in paragraph two (2) of this Order and whether the Debtors shall be permitted to continue to use cash collateral shall be scheduled at the following date, time, and place:

WEDNESDAY, JULY 1, 1987, AT 10:00 A.M. at Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.