**In re Natalino & Ruth CAPODANNO, Debtors.**

**Bankruptcy No. 87–05961S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 3, 1988.

Eric L. Frank, Community Legal Services, Inc., Philadelphia, Pa., for debtors.

A.P. Libetti, Philadelphia, Pa., for movants.

Edward Sparkman, Philadelphia, Pa., Trustee.

MEMORANDUM OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

LOUIS AND BARBARA GARZARELLI (hereinafter referred to as "the Movants"), record owners of a premises located at 408 North 64th Street, Philadelphia, Pennsylvania 19151 (hereinafter referred to as "the Premises") filed, on January 14, 1988, a motion seeking relief from the automatic stay, pursuant to 11 U.S.C. § 362(d), as to the Debtors in this Chapter 13 bankruptcy case commenced on December 1, 1987, NATALINO AND RUTH CAPODANNO (hereinafter referred to as "the Debtors").

**14.** *See also* 11 U.S.C. § 365(d)(4).

A hearing was conducted on February 11, 1988.

At the conclusion of the hearing, we hesitated in ruling, because the parties' relationship arose from a Real Estate Installment Sale Contract of June 11, 1985 (hereinafter referred to as "the Contract"), and we had before us another case in which we knew that we would be compelled to consider the nature of such contracts under the Code, *In re Fox, Fox v. Hill*, 83 B.R. 290 (Bankr.E.D.Pa.1988). We wanted to review the facts of this case in light of the legal conclusions that we anticipated reaching in the *Fox* case before tendering our decision. Recognizing that consideration of § 362(d) motions must be expedited, we granted the parties only until February 19, 1988, to simultaneously file briefs in support of their respective positions.

We are issuing our Opinion in *Fox, supra,* on this day. Therein, we conclude that an installment land sale contract (hereinafter referred to as an "ILS Contract"), particularly one within the scope of the Pennsylvania Installment Land Contract Law, 68 P.S. § 901, et seq., such as the contracts in issue both here and in *Fox,* can be characterized by a debtor-vendee as a sale in which the vendors are thereafter secured parties rather than an executory contract, if the debtor unequivocally and timely chooses to do so. We note that the Debtors here have hedged their bets, stating that they would treat the ILS contract as, alternatively, either a security device or as an executory contract. They will, under the terms of the *Fox* decision, have to affirmatively express a choice that they wish to consider this contract a security device prior to Confirmation, or it will be considered as an executory contract, the acceptance of which must be affirmatively indicated prior to Confirmation, or it will be deemed rejected. 11 U.S.C. § 365(d)(2).[1] This result, while not determinative of the motion before us, does provide an enhancement in the rights and options available to the Debtors here under the Contract.

As was the case in *Fox,* we are presented with parties whose business sophistication was approximately equal. Thus, equities which might favor individuals asserting rights against businesses whose bargaining power is superior to that of consumer-debtors and whose financial and emotional stakes are less than that of a consumer-debtor are absent. The Movants are themselves parents of four children who live on modest means in western Pennsylvania. The transfer of their former home to the Debtors was possibly prompted by empathy with the Debtors' need to find a suitable home for their large family, including seven children. It is very likely to be their first and last venture in absentee ownership.

The Contract in issue here is not drawn nearly so favorably to the Movants as was the similar contract as to the interests of the movant in *Fox.* The price of $22,900.00 was, if anything, a bargain, specially if we are to credit the Husband–Debtor's testimony that the present value of the Premises is at least $36,000.00. The down payment of $2,000.00 was more substantial than that in *Fox,* as are the monthly payments required of $400.00. However, the Contract inexplicably does not appear to require the allocation of any portion of the monthly payments to interest.[2] Thus, after allocation of monthly payments to one-twelfth of the annual real estate taxes and insurance, and to any repairs and assessments, the net amount is to be applied to the remaining principal balance of $20,900.00. When the balance was reduced to $17,900.00, the Movants were entitled to give the Debtors ninety (90) days to obtain a mortgage from a third party and go to settlement.

According to the unrebutted testimony of the Husband–Movant, the Debtors made

---

**1.** As we indicate in *Fox, supra,* at 295 & n. 1, the consequence of a rejection of a residential lease should not, however, automatically result in the termination of a debtor's residential lease.

**2.** The form on which the Contract is drawn states that interest is first to be paid "at the rate of [blank] percent per annum." This would appear to eliminate any requirement of an interest payment.

ten $400.00 payments, from August, 1985, through May, 1986. They then paid $200.00 monthly from June through August, 1986, and nothing for the next sixteen months through the end of 1987. Having insufficient funds to carry their own mortgage on the Premises with Philadelphia Savings Fund Society (hereinafter referred to as "PSFS"), in addition to their own housing costs, the Movants have fallen behind over $2,200.00 in arrears to PSFS and are reportedly in jeopardy of foreclosure and a Chapter 13 filing themselves. Several photographs were admitted into evidence, which reveal that the Debtors have made a huge excavation in the back yard of the Premises to accommodate a large above-ground swimming pool. The interior of the Premises is, in some respects, deteriorating and poorly maintained by the Debtors.

The Debtors did, however, tender their $400.00 January, 1988, payment directly to the Movants, and a $400.00 payment for February, 1988, was presented to the Movants' counsel at the hearing on February 11, 1988. The Husband–Debtor testified that he had recently become employed and could continue these payments. However, he quickly became not only defensive but combative when cross-examined about the reasons for not making payments and the condition of the premises. His contention that the Debtors improved the property more than they caused it to deteriorate, allegedly enhancing its value from $36,000.00 to $40,000.00, was not convincing. Nevertheless, the pre-petition down-payment of $2,000, ten payments of $400.00 and three payments of $200.00, plus the two post-petition $400.00 payments, total $7,400.00 in payments made by the Debtors. Thus, the balance due to the Movants is probably about $17,000.00, taking into account unspecified sums for taxes and water and sewer rents and any repairs and assessments, also unspecified, which should be added to the $15,500.00 difference between the balance ($22,900.00) and the payments ($7,400.00). The value of the premises is, we believe, about $25,000.00.

The grounds articulated by the Movants as justification for relief from the stay are as follows:

1. The Debtors were seriously delinquent—allegedly $7,200.00—in pre-petition payments.

2. The Movants require a substantial lump sum payment to adequately protect *them* from foreclosure by PSFS, which the Debtors are not offering.

3. The court should only concern itself with the issue of whether the Movants have "a colorable claim to a perfected security interest" and, finding same, should lift the stay on authority of *In re Quality Electronics Center, Inc.*, 57 B.R. 288 (Bankr.D.N.M.1986), the only citation appearing in the Movants' Brief.

It is not surprising to discover that the Movants have seriously misread the *Quality Electronics* decision. In fact, the court there was addressing its own peculiar procedure for deciding § 362(d) motions promptly. In the course of this discussion, it stated that, in determining the element of the "validity, priority and extent of a lien as a part of stay litigation," it would limit its inquiry to whether the movant "has a colorable claim to a perfected security interest." 57 B.R. at 290. The court did *not* say that, by proving the element of a colorable secured claim, the movant was, without proof of more, entitled to relief from the automatic stay. Any such statement would be most surprising. If this were so, the automatic stay would be virtually useless to any mortgagor-debtors, since such parties are rarely able to place in issue any question about the validity of their mortgages.

 Rather, as the Code clearly provides, a debtor can succeed in a motion for relief from the stay by showing that his Plan adequately protects the secured party's admittedly-valid secured interest. *See, e.g., Fox, supra,* at 302–303; *In re Cann & Saul Steel Co.,* 76 B.R. 479, 484–88 (Bankr.E.D.Pa.1987); *In re Mitchell,* 75 B.R. 593, 597–600 (Bankr.E.D.Pa.1987); *In re Crompton,* 73 B.R. 800, 809–12 (Bankr. E.D.Pa.1987); and *In re Grant Broadcasting of Philadelphia, Inc., (First Opinion),*

71 B.R. 376, 384–89 (Bankr.E.D.Pa.1987), *aff'd*, 75 B.R. 819 (E.D.Pa.1987). Adequate protection will effectively counter any contention that failure to remit past payments is "cause" for relief from the stay under § 362(d)(1), and a realistic and feasible Plan, including payments sufficient to retain a debtor's residence will perforce establish that the premises is necessary to an effective reorganization, thus preventing relief from the stay under § 362(d)(2).

This argument based upon *Quality Electronics,* suggests that the Movants, unlike the similarly-situated party in *Fox,* concede that the Contract in issue here may be treated like a security device instead of as an executory contract. Since the Debtors here have already paid a total sum to the Movants which is apparently sufficient to allow them to go to settlement on the Premises, unlike the *Fox* debtor, the Debtors' status as equitable owners of the Premises also appears more secure than that of the *Fox* debtor.

■ Therefore, the Debtors' failure to make even substantial pre-petition payments is clearly not, as the Movants appear to suggest, *ipso facto* conclusive in establishing the Movants' right to relief under § 362(d). As we stated in *In re Tashjian,* 72 B.R. 968, 973 (Bankr.E.D.Pa.1987):

> we believe that determination of whether a secured lender received "adequate protection" from a debtor requires an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performances in accordance with the Plan. *See [Grant Broadcasting, supra.]* While of course the last element requires some analysis of the Debtor's payment performances, this element should not, as the [§ 362(d) moving party] apparently suggests, be isolated from the other elements and utilized alone as a basis to deprive a debtor

of one of the most valuable tools with which the bankruptcy filing equips him or her.

Of course, as we pointed out in *In re Kessler,* 76 B.R. 434, 437–38 (Bankr.E.D. Pa.1987), a failure to make payments is not an insubstantial factor in determining whether relief under § 362(d) is appropriate. However, in *Mitchell, supra,* Chapter 13 debtors who proposed a confirmable plan, even in the face of an "abysmal pre-petition payment record," 75 B.R. at 599, were given an opportunity to stave off relief from the automatic stay, provided that they also made all future payments towards real estate taxes and insurance. 75 B.R. at 599–600. *Accord, Fox, supra,* at 303; and *Crompton, supra,* 73 B.R. at 810–11.

We also note that the Debtors here, unlike the debtors in *Cann & Saul, supra,* 76 B.R. at 484–85; *Mitchell, supra,* 75 B.R. at 598; and *Crompton, supra,* 73 B.R. at 811, have an "equity cushion" of about thirty-two (32%) percent in the premises.[3] In *In re Hèath,* 79 B.R. 616, 618 (Bankr.E.D.Pa. 1987), a comparable equity cushion was held sufficient to avert § 362(d) relief as to a debtor who had made no recent payments and whose unlikely prospects of making even post-payments were causing the equity cushion to erode. *Compare Grant Broadcasting, supra,* 71 B.R. at 386–87 (27.5% equity cushion where debtors were not making any payments sufficed to withstand § 362(d) motion).

Finally, the Movants point to their own dire financial straits and likely subjection to foreclosure as to the Premises at the hands of PSFS as a ground for granting relief to them. However, as the Debtors point out in their Brief, the equitable interest of their estate in the premises, *see Fox, supra,* at 301–303, may extend the application of, ironically, the very automatic stay from which the Movants seek relief to efforts by PSFS to foreclose upon the Movants. The Debtors appropriately point to the decisions in *In re 48th Street Steak-*

---

**3.** If we assume a value of $25,000.00 of the Premises, and a balance of $17,000.00 due to complete the purchase, the Debtors would have exactly the thirty-two (32%) percent equity cushion.

*house, Inc.,* 835 F.2d 427, 430–31 (2d Cir. 1987); *In re Black,* 58 B.R. 60, 61–62 (Bankr.E.D.Pa.1986); and *In re Golden Plan of California,* 39 B.R. 551, 554–55 (Bankr.E.D.Cal.1984), as instances where the scope of §§ 362(a)(3) and (a)(4) was extended to actions by parties who did not have a direct contractual relationship with debtors, but who attempted to terminate a lease or foreclose on property in which the estate of a bankruptcy debtor had an interest. Arguably, the co-debtor stay of § 1301(a) also extends to the Movants to protect them from action against them by PSFS in reference to the Premises. Therefore, we do not believe that the third justification cited by the Movants as a basis to obtain relief from the stay has any merit, either.

We do sympathize with the Movants, as we did to some degree as to the movant in *Fox.* Here, moreover, the Movants are not, like the movant in *Fox,* chargeable with marketing an unfit premises which was grossly overpriced to the Movants. We are also dismayed to note the Debtors' treatment of the property, particularly the large excavation in the back yard. However, waste of the property, which could constitute "cause" under § 362(d)(1) in itself, was not an articulated basis of the motion.

Therefore, we conclude that, like the debtors in *Fox, Mitchell,* and *Crompton,* the Debtors here are entitled to avoid the granting of relief from the stay, upon the imposition of certain conditions. One condition is continued payments of $400.00 monthly unless and until a confirmed Plan which would adequately protect the Movants otherwise emerges. We will also require that the Debtors remit payments to the Movants on account of 1988 real estate taxes and insurance and for future water and sewer rents in addition. Although the $400.00 monthly payments would include payments for these items, it is apparent that no payments were made on these obligations in 1987 and even for part of 1986, and that delinquencies from these years for which the Debtors are ultimately responsible are likely to exist. *Compare Mitch-*

*ell, supra,* 75 B.R. at 599, 601; and *Crompton, supra,* 73 B.R. at 810–11.

An Order consistent with this Memorandum Opinion will be entered.

## ORDER

AND NOW, this 3rd day of March, 1988, after a hearing of February 11, 1988, on the Motion of Louis and Barbara Garzarelli (hereinafter referred to as "the Movants") for relief from the automatic stay and upon consideration of the Briefs of the parties, it is hereby ORDERED AND DECREED as follows:

1. The Movants' Motion for Relief from the Automatic Stay is DENIED on the condition that the Debtors do the following:

 a. Continue making payments of $400.00 monthly to the Movants on or before the fifteenth (15th) day of March, 1988, and each succeeding month unless and until a Plan is confirmed which contemplates remittance of a different sum to satisfy the Movant's claim.

 b. Obtain and/or pay for fire insurance on the Premises on or before May 1, 1988.

 c. Pay all future real estate taxes and water and sewer bills relative to the Premises as they come due.

 d. If the Debtors fail to comply with any of the terms of paragraphs 1(a), (b), or (c) herein, the Movants' shall provide notice of same to Debtors and their Counsel. If the default is not cured within twenty (20) days and no order granting any dispensation on motion for good cause shown is granted, the Movants may certify same to the Court and obtain relief from the stay.

2. The Standing Chapter 13 Trustee shall schedule a § 341 creditors' meeting on or before April 15, 1988, in this case.