**In the Matter of WINDTECH, INC., Debtor.**

**Bankruptcy No. 2–86–01275.**

United States Bankruptcy Court, D. Connecticut.

May 1, 1987.

Patrick W. Boatman and Thomas C. Boscarino, Berman, Sable & Boatman, Hartford, Conn., for debtor.

Howard L. Siegel and Scott D. Rosen, Hoberman & Pollack, P.C., Hartford, Conn., for Zephyr Park, Ltd., et al., movants.

Steven M. Zelman, Rome, Case, Kennelly & Klebanoff, P.C., Bloomfield, Conn., for Creditors' Committee.

### RULING ON MOTION TO CHANGE VENUE OF CASE

ROBERT L. KRECHEVSKY, Chief Judge.

#### I.

A hearing has been held on a motion by a creditor, Zephyr Park, Ltd. (Zephyr),[1] to change the venue of the above chapter 11 case from the United States Bankruptcy Court for the District of Connecticut to the United States Bankruptcy Court for the Central District of California.[2] Zephyr filed its motion pursuant to Bankr.R. 1014(a)(1) and 28 U.S.C. § 1412, which provides for the transfer of a case to another district "in the interest of justice or for the convenience of the parties".[3] Zephyr and

---

1. Ian MacInnes, William T. Kritikos, Sr., William T. Kritikos, Jr., and Ted Kritikos, all general or limited partners of Zephyr, are named in the motion as co-movants.

2. The parties apparently agree, and the court concurs, that the ruling on this motion may be entered by the bankruptcy judge, and that the matter need not be referred to the district court for the entry of a final order. *See McLemore v. Thomasson (In re Thomasson),* 60 B.R. 629, 631

(Bankr.M.D.Tenn.1986); *In re Oceanquest Feeder Service, Inc.,* 56 B.R. 715, 718–19 (Bankr.D. Conn.1986).

3. Rule 1014(a)(1) differs slightly from § 1412. It states that the transfer must be "for the convenience of the parties and witnesses in the interest of justice." Section 1412 was enacted subsequent to the promulgation of Rule 1014(a)(1).

the debtor filed proposed findings of fact with their post-hearing memoranda. The official creditors' committee, whose counsel was in attendance during the hearing, filed a posthearing "response" opposing the motion.

## II.

Windtech, Inc., the debtor, filed a voluntary chapter 11 petition on December 24, 1986, in the bankruptcy court at Hartford, Connecticut. Marvin C. Cheney, as its sole stockholder, formed Windtech as a Connecticut stock corporation on December 23, 1981. Cheney, an engineer and a Connecticut resident, had been the manager of wind tunnel technology at United Technologies Research Center, located in East Hartford, Connecticut. Cheney left that position in order to devote his full time to the development of a wind turbine to generate electrical energy. The debtor's business office from its inception has been located in Glastonbury, Connecticut. On November 12, 1984, Cheney caused the formation of a holding company, Windtech Group, Inc., of which he became an 80% stockholder, to acquire the debtor's stock and the stock of an allied company, Windtech Development, Inc. All three corporations maintain their books and records at the same location in Glastonbury.

The debtor produced its first turbine in 1983. By that time, a wind turbine industry had developed as a result of the nationwide energy crisis of the late 1970s. The industry used wind turbines to convert wind into electrical energy. Private investment in wind turbines was encouraged by advantageous federal and state tax treatment, coupled with federal legislation requiring public utilities to purchase the electricity so generated. The turbines were placed in "wind parks", generally located in California because of the favorable wind and geographical conditions there.

The general pattern in the industry was for the turbines to be produced by a manufacturer who sold them to wind park developers. These developers provided sites in wind parks with the necessary facilities to transmit the electrical energy to utility companies. The developers sold the "sited" turbines to investors who, in turn, contracted with the developers for the management and maintenance of the turbines.

The debtor designed its turbines in Connecticut and negotiated sales to developers, all of whom were located in California. The debtor purchased the component parts of the turbine from companies across the country, assembled the turbines at various locations in California and delivered them to the several wind parks designated by the developers.

During 1983, the debtor produced 155 turbines, thirty-five of which were purchased by Zephyr, a California limited partnership and the developer of a wind park in Kern County, California. The debtor sold 115 turbines in 1983 to Arbutus Corporation for installation at its wind park adjacent to the Zephyr wind park. The debtor manufactured forty-two turbines in 1984, and forty-nine during 1985. The debtor anticipated selling many of these turbines to Sunbelt Group, Inc. (Sunbelt) for installation in a wind park in Palm Springs, California. Sunbelt defaulted on its purchase, and Cheney then formed Windtech Development, Inc. as an entity to be used for the purpose of purchasing fifty-six turbines and completing the development, along with Sunbelt, of the Palm Springs location. The debtor, in 1985, sold forty-nine turbines for installation at Palm Springs to W.D. Energy, Inc., a California corporation formed by the debtor's principals. No turbines have been made since 1985, and no further turbine manufacturing is contemplated. The wind turbine industry is currently dormant because of tax law changes and the abatement of the energy crisis.

The purchase price of the thirty-five turbines sold to Zephyr in 1983 was $1,645,-000.00, with $1,300,000.00 paid in cash. The balance of $345,000.00 was to be paid early in 1984. Zephyr sold twenty-six turbines to investors and three to William T. Kritikos, Sr. (a co-movant), and retained title to six turbines for its own account. The offering circular Zephyr furnished to

investors stated that "Windtech will warrant the Wind Turbines (1) to be free of defects in workmanship and material; and (2)·to conform to the Wind Turbine descriptions provided to Zephyr Park ... [who] will assign the warranty to the purchaser...." The circular further stated that the debtor was negotiating to obtain insurance covering its warranty obligations.[4] The debtor procured a policy of warranty insurance from Aetna Casualty and Surety Co. (Aetna) through an agent in East Hartford.

In the course of time, significant problems arose in the operation of all the turbines, and during 1985, litigation ensued in California. Some forty-three investors brought suit against Arbutus Corporation, the debtor and others. Another investor group sued Zephyr, who crossclaimed against the debtor. The debtor, in 1984, had started a suit in California against Zephyr to collect the unpaid balance of the purchase price for the turbines, and Zephyr counterclaimed for $1,206,000.00 in damages.

Since 1985, the debtor has been primarily involved in attempts to redesign and make modifications to the turbines, litigation with developers and investors, making claims against the makers of alleged defective components of the turbines, fending off trade creditors, attempting to collect on promissory notes it holds, and negotiating with Aetna on the warranty insurance policy.[5] The debtor's schedule of creditors lists 146 creditors, of whom fifty-seven are California investors with disputed claims. The movants note that 105 of the 146 creditors have California addresses.

The debtor's principal assets are cash on hand ($114,663.00) and claims against parties, including Aetna, estimated at $2,241,000.00. On April 6, 1987, Aetna instituted an interpleader action in this court to determine, *inter alia*, the insurance policy limits and entitlement to the proceeds of the policy. Aetna named as parties defendant over 100 purchasers of turbines, virtually all of whom reside in California, and deposited over $1,000,000.00 in the court's registry.

### III.

Zephyr does not contend that the debtor chose an improper district under 28 U.S.C. § 1408[6] when it filed its bankruptcy petition in the District of Connecticut. If a debtor originally files in a proper district, the court then exercises its power to transfer under § 1412 cautiously, and the party seeking a change of venue must show by a preponderance of the evidence that the case should be transferred elsewhere. *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co., Inc. (In re Commonwealth Oil Refining Co., Inc.)*, 596 F.2d 1239, 1241 (5th Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 732, 64 L.Ed.2d 731 (1980);[7] *In re Walter*, 47 B.R. 240, 241 (Bankr.M.D.Fla.1985).

---

**4.** The circular cautioned that there was significant risk in this type of an investment and that a purchaser of a turbine must have, *inter alia*, a net worth of $250,000.00, exclusive of home, furniture and automobiles.

**5.** The debtor may or may not be a party to management and maintenance contracts for turbines sited in Palm Springs, California. The debtor's amended schedules list no such contracts.

**6.** 28 U.S.C. § 1408 states:

Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

**7.** In *Commonwealth Oil Refining Co., Inc.*, the court was interpreting former Bankruptcy Rule 116(b)(1), which provided for transfers where it was in "the interest of justice and ... the convenience of the parties", a provision similar to the present rule. *See* 1 *Collier on Bankruptcy* ¶ 3.02[4][c][i] (L. King 15th ed. 1986) ("[T]he standard for transferring a ... case under 28 U.S.C. § 1412 remains generally the same as it was under earlier provisions, and thus [previous] case law is still important.").

■ The factors most commonly considered on a motion to transfer are: the proximity of creditors, the debtor and witnesses to the court; the location of the debtor's assets; the economic and efficient administration of the estate; and the necessity for ancillary administration should the case end up in liquidation. *Commonwealth Oil Refining*, 596 F.2d at 1247; *In re Kona Joint Venture I, Ltd.*, 62 B.R. 169, 172 (Bankr.D.Hawaii 1986). "[T]he most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate." *Commonwealth Oil Refining* at 1247. On the basis of economy and efficiency, Connecticut is clearly a district more appropriate than California. The debtor's office and all of its records are in Connecticut. The debtor's accountants, with knowledge of its finances and tax returns, and the attorneys who have handled most of its transactions are located in Connecticut. The one person with the most information about all of the debtor's operations, an essential witness in any proceeding, is Cheney, a Connecticut resident. It would be extremely expensive to have the estate fund Cheney's transportation and lodging if this case were transferred to California. *See In re HME Records, Inc.*, 62 B.R. 611, 614 (Bankr.M.D.Tenn.1986).

None of the other factors to be considered are of sufficient significance to warrant transferring this case to California. The only readily-available hard assets of the debtor are its cash and the insurance policy proceeds due from Aetna. Negotiations concerning these monies have been underway in Connecticut for some time. There are no substantial assets in California. Although it would be premature for the court at this time to consider the propriety of the granting of a request for relief from stay, the fact remains that the litigation pending against the debtor in California is stayed by virtue of the bankruptcy filing. Zephyr relies heavily upon the existence of such litigation in California as a basis for the transfer. *Cf. Commonwealth Oil Refining*, 596 F.2d at 1248 n. 20 ("The government ... argues that the case should be transferred because of the extensive litigation ... in Puerto Rico.... Much of that litigation will ... proceed in the appropriate court in Puerto Rico. The litigation involving Spanish civil law in the bankruptcy court could probably be handled more conveniently in Puerto Rico. By itself, however, that is insufficient reason to transfer the case.").

The debtor's schedules indicate that the bulk of the estate creditors are located in California. No other creditor, however, has appeared in support of Zephyr's motion to transfer the case. Rather, the major secured creditor, Connecticut Savings Bank, and the official creditors' committee oppose the transfer.[8] The creditors' committee, composed primarily of trade creditors with debts totalling $1,033,666.00, includes two creditors from California (with claims of $600,231.00), two from Connecticut, one from Illinois, and one from Ohio.

As previously noted, the debtor is currently a plaintiff in litigation with Zephyr, in which Zephyr has counterclaimed. The debtor's proposed findings at paragraph 43 state that the debtor "has sought to continue its prefiling contract civil action against Zephyr Park Ltd., but proposes so to do in the United States District Court for the Central District of California where said action has been pending." To that extent, at least, Zephyr will suffer no inconvenience as a result of the case remaining in Connecticut.

## IV.

For all of the above reasons, the court, in its discretion, concludes that the adverse

---

**8.** The creditors' committee argues as follows:

[T]he business operations of the debtor which should be considered paramount are centered in Glastonbury.... Part of the current concern of Windtech is the ongoing negotiation with the Aetna, which is centered in Hartford. The Aetna negotiations are of greater importance to Windtech than the California litigation which can continue to be handled by California counsel, as is presently the case. There has been no showing by the Movant that the debtor cannot properly prosecute it's [sic] Chapter 11 within this jurisdiction, yet the moving of this matter to the Central District of California would seriously disrupt the ongoing operations to the detriment of the unsecured creditors.

*Creditors' Committee Memorandum* at 4.

452

circumstance of creditor proximity is outweighed by the factors of economic and efficient administration of the estate, and denies the motion of Zephyr Park, Ltd. to transfer the debtor's case to California. *See In re Commonwealth Oil Refining Co., Inc., supra; In re HME Records, Inc., supra; In re Kona Joint Venture I, Ltd., supra; In re Holiday Towers, Inc.,* 18 B.R. 183 (Bankr.S.D.Ohio 1982).

This memorandum shall constitute Findings of Fact and Conclusions of Law mandated by Bankruptcy Rule 7052. It is

SO ORDERED.