**In re 1606 NEW HAMPSHIRE AVENUE ASSOCIATES, Debtor.**

**Bankruptcy No. 87–05831S.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 20, 1988.

As Amended May 13, 1988.

Timothy A. Gallogly, Philadelphia, Pa., for debtor.

Myron Bloom, Kevin W. Walsh, Philadelphia, Pa., for Reiss Const. Co.

Douglas Q. Wickham, Raleigh, N.C., Christopher G. Kuhn, Philadelphia, Pa., Joseph J. Levin, Jr., Washington, D.C., for Cavalier Real Estate, Inc.

Paul Rosen, Lawrence Tabas, Philadelphia, Pa., for Dover Admin. Services, Inc.

James J. O'Connell, Kevin Callahan, Office of the U.S. Trustee, Philadelphia, Pa.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION AND PROCEDURAL HISTORY

We are presented with two motions in this case, both of which will be addressed herein: (1) A motion to dismiss or to obtain relief from the stay filed by Cavalier Real Estate, Inc., the Debtor's only admittedly secured creditor (hereinafter referred to as "Cavalier"); and (2) A motion to dismiss or to change venue to the Bankruptcy Court of the District of Columbia (hereinafter referred to as "D.C.") filed by Reiss Construction Company, Inc., another of the Debtor's creditors (hereinafter referred to as "Reiss"). Because the Debtor's sole asset is realty in D.C. and virtually all of the Debtor's creditors are located there, we deem it appropriate to transfer venue of this case to D.C. under 28 U.S.C. § 1412, even though we find that proper venue exists in this court pursuant to 28 U.S.C. § 1408. However, having heard evidence on Cavalier's motion on testimony presented for three days in our court, we believe that conservation of judicial resources is best served by our ruling promptly on the record made on this motion here. We are certainly disinclined to grant the motion to dismiss and we shall deny the motion for relief from the automatic stay, at least on the record made here.

This voluntary Chapter 11 case was filed in our court on November 20, 1987. On January 5, 1988, we entered an order allowing the Debtor to use rental income generated from its only asset, a four-story office building located proximate to Dupont Circle in D.C., to administer the building. On February 3, 1988, we approved a stipulation between Cavalier and the Debtor allowing the Debtor to use the rental income, which was cash collateral for Cavalier's debt, for administration costs of the building under certain stipulated conditions.

Cavalier's instant motion was filed on January 8, 1988. It came before us for a hearing on February 3, 1988, the same date that we were presented with and approved the cash collateral stipulation. We commenced the hearing on that date, receiving testimony from Kent Worthington, a D.C. real estate "evaluator" called as an expert witness by Cavalier. At the conclusion of Mr. Worthington's testimony, the parties expressed an agreement to adjourn the hearing, with the stay remaining in place, until February 23, 1988, when the Debtor's expert, Judith Reynolds, a D.C. real estate appraiser, would be available to appear and testify.

Meanwhile, Reiss filed the second motion before us, seeking to dismiss this case on the ground of improper venue or, alternatively, to change the venue of this case to D.C., on January 19, 1988. A request for expedited disposition of this motion was denied, and a hearing on this matter was also scheduled on February 23, 1988. The parties agreed to continue hearings on both motions until February 24, 1988. We note that, in addition to an Answer from the Debtor, a "motion" in response to Reiss's Motion was filed by the United States Trustee, contending that venue should not be transferred until the Debtor remitted its fee pursuant to 28 U.S.C. § 1930(a)(6) for the most recent quarter.

On February 24, 1988, the parties agreed that we should take evidence on Reiss's motion first, it being important to resolve the venue issue before proceeding to add to the substantive motions before this court if we decided that a venue-change was in order. Hence, we proceeded to complete the hearing on the Reiss motion on that day and thereafter resumed the hearing on the Cavalier motion. At the close of the day, we directed any proponents of the Reiss motion to submit Briefs on or before March 1, 1988, and opponents to submit Briefs on or before March 7, 1988. In addition to receiving the requested Briefs from Reiss and the Debtor, Reiss submitted an unsolicited Supplemental Brief

on March 10, 1988. *But see In re Jung-kurth,* 74 B.R. 323, 326 (Bankr.E.D.Pa. 1987) (submission of supplemental briefs without prior consultation with opponents and court approval is disfavored.)

The parties agreed that the hearing on the Cavalier motion would be concluded on March 4, 1988, which in fact transpired. Upon the conclusion, Cavalier expressed a desire to order a transcript of the hearing on an expedited basis. We than entered an order stating that, if the transcript were in fact completed by March 11, 1988, as projected, Cavalier and the Debtor were to submit briefs on or before March 21, 1988, and March 28, 1988, respectively. Unfortunately, preparation of the transcripts and service by mail of the transcripts and Briefs between D.C. and here resulted in a delay, and the Briefs on Cavalier's motion were not filed until April 12, 1988.

At the close of the hearing on March 4, 1988, we expressed an intention to decide both motions simultaneously, irrespective of the outcome of the venue motion. After consultation with the Honorable C. Martin Teel, the newly-appointed D.C. bankruptcy judge, it was mutually agreed that we would decide both motions, even if the case were ultimately transferred to the D.C. court. As will be noted, we hold that a change of venue to the D.C. court is warranted. Therefore, although we decide Cavalier's motion adversely to that creditor, it is obviously within the power of Cavalier to present another such motion to Judge Teel, as he will be faced with the responsibility of handling all aspects of this case in the future.

We shall herein initially address the Reiss motion and thereafter turn to Cavalier's motion. Because these matters are motions rather than adversary proceedings, we shall present our decision in narrative form. *See In re Campfire Shop, Inc.,* 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987). Resolution of the relatively few factual issues shall be made in the course of our opinion.

## B. THE MOTION TO CHANGE VENUE WILL BE GRANTED

The only record made by Reiss on its venue motion was documentary. However, unlike the Cavalier motion, this matter was not fact-determinative, and this did not prove to be a drawback. The first four documents offered and admitted were the Debtor's Certificate of Limited Partnership filed with the D.C. Department of Consumer and Regulatory Affairs on February 4, 1985, and Amendments filed thereto on December 27, 1985, December 31, 1985, and September 16, 1987. The 1985 filings consistently recited that the "character" of the business was administration of the property at 1606 New Hampshire Avenue, N.W., Washington, D.C. and that the partnership's principal place of business was 1074 Thomas Jefferson Street, N.W., Washington, D.C. Named as the sole general partners on the first two documents were Dianna J.R. Brochendorff and James S. Sollins, both with an address in D.C. Adam Kauffman, of Philadelphia, was added as a general partner on December 31, 1985. The sole limited partner listed on all documents was Dupont Circle Historic Associates, of Philadelphia (hereinafter referred to as "Dupont"). In the September 27, 1987, amendment, Dover Administrative Services, Inc. (hereinafter referred to as "Dover"), of Philadelphia, replaced Ms. Brochendorff and Mr. Sollins as the sole general partner, and the latter two parties were relegated to limited partnership status.

The fifth and sixth documents offered and admitted were, respectively, pleadings filed in litigation in D.C. in which the Debtor's counsel identified Ms. Brochendorff and Mr. Sollins as the general partners of the Debtor in a document filed in October, 1987, and in which Mr. Kauffman alleged that the above parties resigned as general partners in "mid-August, 1987."

The final document offered and admitted was the Debtor's statements and schedules filed in this court. These list one priority creditor, the D.C. Department of Finance and Revenue; one secured creditor, Cavalier; and twenty-three unsecured creditors, including Reiss, all indicating D.C.–area addresses except one small creditor whose address is given as Kansas City, Missouri.

Mr. Kauffman, the Vice–President of Dover, was called by the Debtor as its only witness. Although he indicated that Dover hired Pier Associates, a D.C. firm, to perform day-to-day management services in the building, he contended that all major management decisions for the Debtor, as well as its record-keeping, were accomplished by Dover in its Philadelphia office. He testified that he personally had conducted the negotiations for rental of a third-floor suite in the premises and that he was, effectively, the rental agent.

While Mr. Kauffman indicated that Ms. Brochendorff and Mr. Sollins, both situated in D.C., were instrumental in management of the Debtor though spring, 1987, he further stated that thereafter Dover had become increasingly suspicious of irregularities on their part and increasingly active in its own management role as a result. This situation culminated on July 24, 1987, when Ms. Brochendorff visited Dover's Philadelphia office and delivered over certain records and full management responsibility of the Debtor to Dover. Since then, per Mr. Kauffman, Ms. Brochendorff and Mr. Sollins have played no further function with the Debtor, other than serving as a target of investigation as to their role in the Debtor's claims against Cavalier's assignor, Riggs National Bank of Washington, D.C. (hereinafter referred to as "Riggs"), as decribed at pages 306–07 *infra*.

Reiss contends that the prerequisites for proper venue of the case in this district pursuant to 28 U.S.C. § 1408, are not met, or, alternatively, if they are met, venue should be transferred to D.C., pursuant to 28 U.S.C. § 1412.

■ We first consider whether the Debtor can met the conditions of 28 U.S.C. § 1408, which are as follows:

§ 1408. Venue of cases under Title 11

Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

The starting point of Reiss in its analysis on this issue is citation of the discussion of this provision relative to its predecessor in the context of the Bankruptcy Act, former Bankruptcy Rule 116(a). 1 COLLIER ON BANKRUPTCY, ¶ 3.02[1][c][i], [ii], at 3–113 to 3–114 (15th ed. 1987). While the present statute is said to have broadened the predecessor Rule by adding a statement that the district in which the debtor's principal assets are located may be an alternative appropriate situs of venue, the failure of the statute to adopt the Rule's distinct treatment of individuals and business entities is said to have possibly caused serious problems in the case of partnerships. *Id.* Collier points out that a partnership does not have a "residence" or "domicile," and hence that venue, as to a partnership, is limited to the entity's principal place of business or the locus of its principal assets.

Reiss then argues that the principal asset of the Debtor is in D.C., which is impossible to dispute. Finally, it argues that the Debtor's Certificate of Limited Partnership and amendments thereto have always recited that the Debtor's principal place of business is in D.C. However, it must be recalled that the testimony of Mr. Kauffman, indicating that all significant management decisions of the Debtor have been made by Dover from its Philadelphia office since July 24, 1987, is unrebutted.

The clear weight of authority supports the Debtor's hypothesis that venue in this district is proper, irrespective of the location of the Debtor's sole asset in D.C., if in fact significant management decisions of

the Debtor have been made in Philadelphia since July 24, 1987. *See e.g., In re Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1243–47 (5th Cir.1979) (hereinafter *"CORCO"*); *In re Spicer Oaks Apts.*, 80 B.R. 142, 143 (Bankr.E.D.Mo.1987); *In re Baltimore Food Systems, Inc.*, 71 B.R. 795, 798–801 (Bankr.D.S.C.1986); *In re Landmark Capital Co.*, 19 B.R. 342, 344–48 (Bankr.S.D.N.Y.1982); and *In re Greenridge Apts.*, 13 B.R. 510, 512–13 (Bankr.D. Hawaii 1981). We credit the unrebutted testimony of Mr. Kauffman that this has in fact been the case.

■ We do not think that the recitation in the regulatory-agency filings in D.C. that its principal place of business was in D.C. should estop the Debtor from presenting evidence to the contrary. We note that, in the two cases cited by Reiss which appear to actually support the purported principle that such registration is significant, both courts utilized the Debtor's filing in the place of its *management* as opposed to the locus of its assets, as a reason for *retaining* venue in the jurisdiction where management was located as opposed to changing venue. *In re Monterey Equities–Hillside*, 73 B.R. 749, 753 (Bankr. N.D.Cal.1987); and *In re Island Club Marina Ltd.*, 26 B.R. 505, 506 (Bankr.N.D.Ill. 1983). We are not prepared to utilize these filings as a basis for closing our eyes to unrebutted evidence of what is really occurring in the operation of the Debtor's business.

We therefore conclude that venue is proper in this district. In so doing, we acknowledge some authority which appears to reach a contrary conclusion on similar facts. *See In re Nantucket Apts. Associates*, 80 B.R. 154, 156 (Bankr.E.D.Mo.1987) (locus of "day-to-day" management at place of realty asset requires a conclusion that the principal place of business of a partnership is at the place of the realty); and *In re Dock of the Bay, Inc.*, 24 B.R. 811, 814–15 (Bankr.E.D.N.Y.1982) (the debtor is said to be "doing business" only at the situs of the business itself, not at its "financial heart" or "nerve center"). However, we believe that the weight of authority requires a finding that venue is proper in this district under 28 U.S.C. § 1408.

■ Our conclusion that venue is proper here eliminates any possibility that the proper response to this motion would be dismissal of the case, as opposed to transferral of this case, assuming *arguendo* that dismissal would ever be warranted in a situation where venue was improper. *See Nantucket, supra*, 80 B.R. at 157; and *Monterey, supra*, 73 B.R. at 753 (case filed where venue is improper should be transferred, not dismissed). However, this conclusion does not totally win the day for the Debtor, as we must then consider whether venue, even if proper, should be transferred from this district to D.C. for equitable reasons, pursuant to 28 U.S.C. § 1412. Consideration of this statutory provision leads us to conclude that venue should indeed be transferred to D.C.

The statutory provision relating to change of venue for equitable reasons, 28 U.S.C. § 1412, reads simply as follows:

§ 1412. Change of venue

A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

The pertinent criteria employed by courts to determine whether to transfer a case on the basis of this provision are set out in Collier, quoting *CORCO, supra*, 596 F.2d at 1247, as follows:

"(1) The proximity of creditors of every kind to the court; (2) the proximity of the bankrupt (debtor) to the court; (3) the proximity of the witnesses necessary to the administration of the estate; (4) the location of the assets; (5) the economic administration of the estate; (6) the necessity for ancillary administration if [liquidation] should result."

1 COLLIER, *supra*, ¶ 3.02[4][c][i], at 3–142. *See, e.g., In re Wood Family Interests, Ltd.*, 78 B.R. 434, 434 n. 3 (Bankr.E.D.Pa. 1987) (TWARDOWSKI, CH. J.); *In re Almeida*, 37 B.R. 186, 188 (Bankr.E.D.Pa. 1984) (GOLDHABER, CH. J.); and *In re Birchminster Corp. of California*, 6 B.R. 258, 260 (Bankr.E.D.Pa.1980) (KING, J.).

It cannot be doubted that the first and fourth criteria point very strongly towards a transfer of venue to D.C. All creditors except one are located proximate to D.C.; no creditors are located in or close to Philadelphia. The only asset of the Debtor is in D.C.

The third and sixth criteria also appear to pull heavily in the direction of a transfer to D.C. In the proceedings on the Cavalier motion, we have already entertained testimony from two Washington-based witnesses, and were forced to accept a deposition in lieu of testimony from two others due to their location in Washington. Counsel for Cavalier are situated in or relatively close to D.C. If ancillary jurisdiction were needed, clearly such proceedings would take place in D.C.

The Debtor's strongest counter-arguments are that Dover and Mr. Kauffman are proximate to this court and that, having chosen this forum, the Debtor obviously has concluded that this case can be most economically and efficiently administered here.

The key to proper resolution of this matter is provided in *Wood Family*, a case which presented facts analogous to those here. There, Chief Judge Twardowski refused to consider "economic administration" as the "most important" criterion to be considered [1] and, in proceeding to transfer venue, cited with approval those cases which have held that "the fact that real estate is located in a particular jurisdiction 'overwhelmingly militates' in favor of transfer to that jurisdiction." 78 B.R. at 434 & n. 4.

Indeed, the case quoted in *Wood Family*, *In re Eleven Oak Tower Ltd. Partnership*, 59 B.R. 626, 629 (Bankr.N.D.Ill.1986), does so hold *in haec verba. Accord, In re Old Delmar Corp.*, 45 B.R. 883, 884 (Bankr.S. D.N.Y.1985). A similarly-strong statement is made in *In re Dew Mortgage Co.*, 10 B.R. 242, 244 (Bankr.M.D.Fla.1981), where it is said that "[m]atters concerning real property have always been of local concern and traditionally decided at the situs of the property."

Particularly persuasive is the large body of cases which hold that, while venue is proper at the situs of the management office of a debtor that manages realty located elsewhere, venue should be transferred to the locus of the realty upon motion of creditors. *See Spicer Oaks, supra*, 80 B.R. at 143–44; *In re 19101 Corp.*, 74 B.R. 34, 35–36 (Bankr.D.R.I.1987); *Landmark, supra*, 19 B.R. at 348–49 (debtor there had some realty in the district where management was situated, but venue was nevertheless transferred because the Debtor's principal holdings were elsewhere); *Greenridge, supra*, 13 B.R. at 513; and *In re Macon Uplands Venture*, 2 B.R. 444, 451 (Bankr.D.Md.1980).

We do acknowledge that motions to change venue have been denied in some cases where a debtor managing realty located elsewhere seeks to maintain a bankruptcy case in the district where management is located. However, two characteristics which are absent here are significant in disposition of these cases: (1) A substantial number of creditors concur that venue should be retained by the court where the filing originally was made. *See CORCO, supra*, 596 F.2d at 1248; *Baltimore Food, supra*, 71 B.R. at 802; *Island Club, supra*, 26 B.R. at 507, 508; and *In re One–Eighty Investments, Inc.*, 18 B.R. 725, 728 (Bankr. N.D.Ill.1981); or (2) The realty in issue is undeveloped and hence testimony regarding its value and the operation of business on it is limited. *See In re Boca Development Associates*, 18 B.R. 648, 651, 653–54 (Bankr.S.D.N.Y.1982); and *In re Marina Enterprises, Inc.*, 14 B.R. 327, 332–34 (Bankr.S.D.Fla.1981).

Here, Cavalier, by far the Debtor's largest creditor and its only admittedly secured

---

1. The case which is most expressive on the point that "economic administration" is of primary significance is *In re Windtech, Inc.*, 73 B.R. 448, 451 (Bankr.D.Conn.1987). However, the Debtor there had a long history of presence in Connecticut, where it had filed its bankruptcy, and its presence in California, the jurisdiction to which transfer was sought, was due to its need to establish a "wind park" where environmental conditions were ideal, i.e., in California. *Id.* at 449. Clearly, these facts are quite distinct from those of the instant case.

creditor, has joined Reiss in requesting a change of venue. The Debtor's only ally on this motion has been Dupont, its largest limited partner, whose offices are located at the same address as those of Dover. Dupont is, however, not a creditor, and appears to simply share the interests of the Debtor. Its joinder with the Debtor does not therefore count for much. And, clearly, the realty in issue here is developed.

We therefore find little or no authority which supports the Debtor's position that the presence of the management of improved realty here should outweigh the locus of the realty outside of this district, over the unanimous objection of the largest creditors. We also observe that the management function of the Debtor moved to this district in barely sufficient time to meet the time requirements of 28 U.S.C. § 1408, on July 24, 1987. *Compare Windtech, supra* (management of the debtor had been located in the district of filing since the debtor's inception).

We also briefly touch on several related considerations. First, we note that Reiss is not guilty of such delay in raising the venue question as could justify our denial of its motion on that basis. *Compare In re Jones*, 39 B.R. 1019, 1020 (Bankr.S.D.N.Y.1984) (delay of one and one-half years in filing motion to change venue warrants its denial). Reiss's motion was filed within sixty days from the commencement of the case; expedited consideration, though denied, was sought; and the first major motion was not yet decided before the venue-change motion was filed.

Secondly, we recognize that the two competing districts are not a great distance from each other, which lessens the hardships no matter what decision is reached. *Compare Wood Family* (competing jurisdiction to ours was Colorado). On the other hand, the distance is not *de minimus*, as in *In re Franklin Computer Corp.*, 50 B.R. 620, 626–27 (Bankr.E.D.Pa.1985) (competing jurisdiction was New Jersey).

Finally, different consequences ensue when the movant seeks transfer venue of an adversarial proceeding within a case rather than, as here, transfer of the entire case. We are most reluctant to allow pieces to be severed from a case, requiring litigation in several jurisdictions, rather than the desired goal of "centering" administration of an entire case in one jurisdiction. *Compare In re American International Airways, Inc.*, 66 B.R. 642, 645 (Bankr.E.D.Pa.1986). Here, however, the transfer of the entire case to a jurisdiction where related proceedings have already transpired in the local courts mandates different considerations. *But see In re Leedy Mortgage Co.*, 62 B.R. 303 (E.D.Pa.1986) (adversary proceeding in a main case remaining in this jurisdiction was transferred, over objection of the trustee, because most of the witnesses were situated in Alabama, the jurisdiction to which the proceeding was transferred).

We shall therefore grant the motion of Reiss, at least in substantial part, and transfer the venue of this case to D.C. We shall also direct that the Debtor pay the fee required by 28 U.S.C. § 1930(a)(6) within five (5) days to avert dismissal of the case, if, as represented, it has not already done so.

## C. CAVALIER HAS FAILED TO MEET ITS NECESSARY BURDENS TO DISMISS THIS CASE ON GROUNDS OF "BAD FAITH" OR TO OBTAIN RELIEF FROM THE AUTOMATIC STAY

In contrast to the rather full and orderly presentation of all facts which appeared to us to be relevant to the venue motion by both Reiss and the Debtor, the record made by the interested parties on Cavalier's motion to dismiss or to obtain relief from the automatic stay appeared piecemeal and scanty. Part of the difficulty may to have arisen from the lack of proximity of Cavalier's counsel and potential witnesses to this court, a problem which our decision as to venue should remedy. The Debtor, recognizing that this court has repeatedly held that the movant must make a *prima facie* showing of entitlement to relief to succeed on a motion pursuant to § 362(d), *see, e.g.,* *In re Metro Transportation Co.*, 82 B.R. 351, 353 (Bankr.E.D.Pa.1988); *In re Ron-*

*ald Perlstein Enterprises, Inc.,* 70 B.R. 1005, 1009 (Bankr.E.D.Pa.1987), *appeal dismissed,* C.A. No. 87–2364 (E.D.Pa. June 25, 1987); and *In re Stranahan Gear Co.,* 67 B.R. 834, 836–38 (Bankr.E.D.Pa.1986), apparently chose to keep the record short and gap-filled in response to Cavalier's very brief presentation.

The only witness called by Cavalier was Kent Worthington, a D.C. real estate "evaluator," who placed the value of the building in issue at "approximately $1,750,-000.00." Almost as an afterthought, at the final March 4, 1988, session subsequent to the February 24, 1988, session wherein it rested, did Cavalier so much as offer the underlying Deed of Trust Note and Security Agreement between its assignor, Riggs, and the Debtor which was the basis of claim. Although Cavalier argues, in its Brief, that the balance due on the Note is $2,048,336.27, it provided no evidence whatsoever as to how this sum was calculated. The principal of the Note, in the face amount of $1,700,000.00 and dated November 26, 1985, was payable thirty-six (36) months from its date and hence at a date which has not yet arrived. All that was payable in the thirty-six (36)–month interim was interest, recited to be calculated at one and one-half (1½%) percent above prime. This interest rate was never translated into a number by Cavalier, nor were any dates or amounts of payment recited. The only testimony regarding payments was from Mr. Kauffman who testified, without elaboration, that "payments are being made." Review of the bench opinion in one of the D.C. local court actions mentioned at page 307 *infra* suggests that monthly payments of $13,500.00 were not made in January, May, or June, 1987. However, the record here is devoid of any evidence in this regard and we cannot make our record from selectively reviewing the masses of related pleadings and transcripts from other cases not admitted into the record here and simply submitted to us by the parties as exhibits to Briefs or pleadings.

The Debtor called two witnesses, Judith Reynolds, who had performed thorough appraisals of the property in December, 1984, and February, 1988, resulting in figures of $2,650,000.00, and $2,150,000.00, respectively; and Mr. Kauffman. Ms. Reynolds was, like Mr. Worthington, an expert witness called only to establish the value of the building in issue. Mr. Kauffman was the only witness called to present the underlying saga of all of the other relevant issues except value. Not surprisingly, he presented the facts in a manner sympathetic to the Debtor. Unfortunately for Cavalier, it presented no live witnesses to rebut Mr. Kauffman's low-key and credible factual recitation.

Before commencing upon our brief analysis of the underlying facts, some comparison between the testimony of Mr. Worthington and Ms. Reynolds is necessary. Suffice to say that there was virtually no comparison, because Ms. Reymonds proved to be eminently more qualified, capable, disinterested, and hence credible than Mr. Worthington. Mr. Worthington's professional status rises no higher than that of a real estate salesman. He is admittedly neither an appraiser, a broker, nor an agent. He has been in the "real estate business" for only "about six years" and in "the development business" for "not quite three years." He produced no written appraisal or other work-product regarding the building in issue. This is in large part because he admittedly was not capable of producing a formal appraisal, and he hence referred to his conclusion as a "valuation." With some reluctance, we qualified him to provide expert testimony at all. We later learned that he is a "project manager" working for Richard Naing, a principal of Cavalier, thus raising a considerable question regarding his independence.

On the other hand, Ms. Reynolds was a consummate professional, who has been a certified appraiser of realty in D.C. for twenty-two (22) years. She is the author of several articles on appraisals of historic properties such as the building in issue and has served on the D.C. tax appeals board. As indicated above, she prepared two complete written appraisals of the premises, utilizing a sales comparison approach, income capitalization approach, and discounted cash flow approach on each occasion and

drawing her conclusion only upon a composite of all three approaches. She was totally independent. She opined that the value of the building was likely to increase hereafter, attributing the rather significant decline in the valuation between her December, 1984, and February, 1988, appraisals to two factors: (1) Inclusion of space for a projected addition to the building which was not in fact accomplished in the earlier appraisal; and (2) The placement of an easement requiring historic preservation of the building by the Debtor, after its acquisition, which was subsequent to her earlier appraisal. We accept her valuation of $2,150,000.00 as the far more accurate assessment of the value of the building in issue.

We now pass to the narrative of Mr. Kauffman regarding the other relevant issues. He claimed that the proceeds of the November 26, 1985, loan were to be allocated, roughly, to $1,000,000.00 for refinancing the loan obtained to purchase the property; $200,000.00 to pay for certain improvements; and $500,000.00 for additional development of the building and a reserve for the interest payments. However, he contended that Ms. Brochendorff and Mr. Sollins, in collaboration with Riggs, improperly distributed the $500,000.00 to projects other than the property in issue. Therefore, he contended that Cavalier, as Riggs' assignee, was owed no more than $1,200,000.00.

Prior to the institution of this bankruptcy case, Dover had instituted four separate lawsuits against Riggs, Cavalier, and other entities in the D.C. courts, seeking to enjoin foreclosure proceedings against the Debtor on the Note on the basis of these alleged improprieties. On November 9, 1987, after a two-day trial in one of these matters on Dover's motion therein for a preliminary injunction, the motion was denied, in a decision supported by a bench opinion by a local D.C. court judge. Cavalier claimed that the bankruptcy filing, a week later, was merely an attempt to forestall foreclosure or have one or more of Dover's lawsuits transferred to a more receptive forum.

Mr. Kauffman presented "projected operating results" relevant to administration of the building by the Debtor for the period from 1988 through 1997. These submissions projected losses through 1990, and profits thereafter. Mr. Kauffman contended that, even if the attempts to obtain redress for the lost $500,000.00 gainst Ms. Brochendorff and Mr. Sollins and Riggs were unsuccessful, the estimated shortfall of about $100,000.00 in projected losses could be made up through assessments from its investors and/or collection of a receivable in the amount of $150,000.00 to $200,000.00 from Dover. He further stated that losses were anticipated in a project to develop a historical building because a significant goal of the participating investors was to reap certain long-range tax advantages which accrued only if the historic building was retained for at least five years.

We wish that we could be more cogent about the relationship between Dover and the Debtor and how and who the investors are. Mr. Kauffman related the somewhat disturbing fact that the investors have not even been enlightened about the filing of this bankruptcy case. However, on most of the subjects which he addressed in this proceeding, Mr. Kauffman was rather vague, at least to our ears which had not heard the testimony in the extended proceedings in the D.C. courts.

Mr. Kauffman expressed generalized confidence that the Debtor would timely file a successful Plan of reorganization, but did not indicate the contours of such a Plan. We note that, without opposition, the exclusivity periods for the Debtor's filing and soliciting acceptances for a Plan were extended to June 3, 1988, and sixty days beyond, respectively, by our order of March 17, 1988. In its Brief, the Debtor was similarly vague on specifics about the contents of a Plan, but equally adamant in its assertion that a Plan would be filed by June 3, 1988.

a. 1. THE DISMISSAL PRONG OF CAVALIER'S MOTION MUST BE DENIED

 Cavalier argues, in the first prong of its motion, that the Debtor filed this

case in "bad faith," thus justifying its dismissal. In this regard Cavalier emphasizes the timing of the filing just after the preliminary injunction motion was denied by the D.C. court, contending that the filing was simply a forum-search to avert a foreclosure.

The record made in this case is a striking contrast to that made in a case where we very recently considered a comparable dismissal-or-stay-relief motion filed in a similar factual setting in *In re Gulph Woods Corp.*, 84 B.R. 961 (Bankr.E.D.Pa.1988). There, we were subjected to eleven full days of testimony not only addressing relatively simple issues of valuation and counter-allegations of breach of contract, but also addressing a plan of confirmation proposed by the Debtor during the completion of the briefing and the testimony. Here, where the underlying facts were truly complex and unusual, we received only conclusory and vague presentation of the underlying facts.

In our *Gulph Woods* decision, we discussed several principles pertinent here. First, regarding the "bad faith" dismissal prong of the secured creditor's motion, we reiterated our observations in *In re Latimer*, 82 B.R. 354, 363–64 (Bankr.E.D.Pa. 1988), that it is doubtful whether there is any requirement that a Chapter 11 case be *filed* in good faith, as contrasted with the express requirement that a Chapter 11 plan be *proposed* in good faith, pursuant to 11 U.S.C. § 1129(a)(3). 84 B.R. at 970. We emphasized our belief that § 1112(b) contains all of the ammunition which a creditor needs and Congress intended to supply to the creditor attempting to squelch an abusive filing. *Id.* at 971. *Accord,* R. Haines, *Good Faith: An Idea Whose Time Has Come and Gone,* NORTON BANKR. L. ADVISOR 1988–No. 4 at 1 (April, 1988). Further, assuming *arguendo* that some limited concept of a good-faith requirement exists to weed out purely abusive filings, *see In re Smith,* 77 B.R. 496, 500 (Bankr.E. D.Pa.1987); and *In re Clinton Centrifuge, Inc.,* 72 B.R. 900, 903–08 (Bankr.E.D.Pa. 1987), we held that the *Gulph Woods* Debtor, which proposed "a plausibly-confirmable plan" (which we nevertheless declined

to confirm in that very opinion) was apparently "motivated by a legitimate intention to effect a successful reorganization." *Id.* at 971.

We certainly are not prepared to pronounce the motives of the Debtor here as less honorable than those of the ill-fated *Gulph Woods* Debtor, whose principal was perhaps an unparalleled bankruptcy recidivist. *See id.* at 965–66, 974. The fact that the Debtor here filed bankruptcy to avert foreclosure and to attempt to change the forum of Dover's initially unsuccessful litigation is not, to our thinking, a badge of bad faith. Rather, most debtors have a motivation of avoiding foreclosures and litigating their disputes in the swift and pragmatic bankruptcy forum in mind when they make a bankruptcy filing. In fact, it is debtors who have *no* such motivations and are using bankruptcy solely as a means to avoid a bad bargain, *see, e.g., In re W. & L. Associates,* 71 B.R. 962, 967–68 (Bankr.E. D.Pa.1987), or to obtain a stay in litigation elsewhere without posting an appeal bond, *see, e.g., Clinton Centrifuge, supra,* 72 B.R. at 903–08, which are most suspect of proceeding in "bad faith." We are, in any event, reluctant to extend the "bad faith" concept, even where it applies, i.e., in determining whether to confirm a Chapter 11 plan, 11 U.S.C. § 1129(a)(3), or a Chapter 13 plan, 11 U.S.C. § 1325(a)(3), beyond disqualification of debtors who are guilty of serious misconduct or dishonesty in the bankruptcy proceeding itself. *See Smith, supra,* 77 B.R. at 500–01; and *In re Gathright,* 67 B.R. 384, 388–90 (Bankr.E.D.Pa. 1986), *appeal dismissed,* 71 B.R. 343 (E.D. Pa.1987). No element of "bad faith," in this sense, is so much as alleged here, much less proven. We shall, therefore, deny Cavalier's request that we dismiss this case on this basis with little hesitancy.

## 2. THE § 362(d) PRONG OF CAVALIER'S MOTION IS LIKEWISE UNSUCCESSFUL

The second prong of Cavalier's motion, the request for relief from the stay, is based upon 11 U.S.C. § 362(d), which reads as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

In *Gulph Woods, supra,* at 972, we collected most of our decisions in this area in the context of consumer cases, *see, e.g., In re Capodanno,* 83 B.R. 285, 287–89 (Bankr. E.D.Pa.1988); *In re Kessler,* 76 B.R. 434, 437–39 (Bankr.E.D.Pa.1987); *In re Mitchell,* 75 B.R. 593, 597–600 (Bankr.E.D.Pa. 1987); *In re Crompton,* 73 B.R. 800, 809–12 (Bankr.E.D.Pa.1987); and *In re Tashjian,* 72 B.R. 968, 973 (Bankr.E.D.Pa.1987), and business cases, *In re Cann & Saul Steel Co.,* 76 B.R. 479, 484–88 (Bankr.E.D. Pa.1987); and *Grant Broadcasting,* 71 B.R. 376, 384–89 (Bankr.E.D.Pa.1987), *aff'd,* 75 B.R. 819 (E.D.Pa.1987). In elaborating upon the considerations which make up the determination process as to whether a secured creditor is adequately protected, per § 362(d)(1), we quoted from *Tashjian, supra,* 72 B.R. at 973, where we articulated these considerations thusly:

we believe that determination of whether a secured lender received "adequate protection" from a debtor requires an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan.

We concluded that, where, as here, the movant's claim is large relative to that of other secured creditors, the element of the presence of equity required by § 362(d)(2)(A) is much like the first two considerations of value and depreciation or appreciation of the secured asset. *Gulph Woods, supra,* at 972. The latter two components, relating to successful reorganization and performance in accordance with a plan, were likened to the "reasonable likelihood of reorganization" requirement of § 362(d)(2)(B). *Id.*

What we did not dwell on in *Gulph Woods* was the issue of burden of proof. We had more than enough testimony on the record from all sides pertinent to every conceivable issue, including value of the secured asset. We could very easily ascertain whether the Debtor there could formulate a successful reorganization plan, since we had the plan full-blown before us for confirmation when considering the § 362(d) motion. However, we noted that, in the more conventional setting where the Debtor's plan would be formulated only some time after a § 362(d) motion would be resolved, as here, "we were quite willing to give the debtors the benefit of the doubt, at an early stage of the case, in hypothesizing whether the debtors could present, and perform according to the terms of, a feasible plan." *Id.* at 973.

A greater focus on burdens of proof was contained in our Opinion in *Grant Broadcasting,* 71 B.R. at 384–86, and in that of this district court affirming that decision, 75 B.R. at 822–24. There, considering both a cash collateral motion by the debtor and a § 362(d) motion, we read § 363(*o*) and § 362(g) together to conclude, regarding the burden of proof as follows:

1. The debtor's burden is greater in succeeding in a cash collateral motion than in withstanding a § 362(d) motion. 71 B.R. at 385; 75 B.R. at 822–23.

2. The party seeking to prevent a debtor from utilizing cash collateral nevertheless has the burden of proving the validity, priority, and extent of its security. 11 U.S. C. § 363(*o*)(2).

3. The party seeking relief under § 362(d) has the burden of proving the debtor's lack of equity in the secured property. 11 U.S.C. § 362(g)(1). (This element must be proven, per § 362(d)(2)(A), to suc-

ceed under § 362(d)(2)). The components of this element are (1) The validity, priority, and extent of the security interests against the property, which are the secured party's burden even on a cash collateral motion; and (2) The value of the secured property, relative to these security interests.

4. If the party seeking relief does not establish its *prima facie* case by proving these elements, the element of lack of adequate protection is not established. (Nor can § 362(d)(2) be successfully invoked on the ground that the debtor lacks equity in the secured property). *Grant Broadcasting, supra,* 71 B.R. 385; 75 B.R. at 822–23.

▮ In the absence of proof of lack of adequate protection of its security interest, the movant can succeed only if the Debtor fails to make any showing of a likelihood of successful reorganization or if it establishes other "cause" for relief by showing that the "balance of hardships" tips in the creditor's favor. The latter course is a difficult undertaking. *See Metro Transportation, supra,* 82 B.R. at 353.

▮ Here, Cavalier bases its motion, pursuant to § 362(d)(1), solely on the ground that it is a secured creditor which is inadequately protected. Factually, Cavalier begins from the premise that the value of the building is "not more than $2.1 million" and that the secured claims against the property are as follows:

| | |
|---|---:|
| Cavalier | $2,048,336.27 |
| Reiss | 51,199.03 |
| Hitt Contracting Co. (hereinafter referred to as "Hitt") | 607,900.00 |
| | $2,707,435.57 |

Based on these figures, Cavalier concludes that there is no equity of the Debtor in the premises, and the Debtor is unable to adequately protect its interests. It also states that the Debtor has failed to provide "positive evidence of some real possibility of reorganization within the near future."

This argument fails because Cavalier is unable, on this record, to meet its burden of proving that the extent of its security interest is greater than, at most, $1,700,000.00, the amount of the note. It never presented any evidence that interest was

imposed and what, if anything, was added to the principal of the note, not yet due, to attain the figure of $2,048,336.37. The only evidence on the record on this point was Mr. Kauffman's denial that any secured claim in excess of $1,200,000.00 is valid.

Cavalier also failed totally to prove the existence of a secured debt in any amount owed to either Reiss or Hitt. Reiss never asserted that it had a secured debt in the course of making its case on the venue motion. Rather, as proof of the presence of the Debtor's creditors, it put into evidence the Debtor's schedules, which listed only Cavalier as a secured creditor. This suggests that Reiss was comfortable with the "unsecured creditor" classification accorded to it by the Debtor in its schedules. The record is similarly totally absent of any proof that Hitt, also listed on the schedules as an unsecured creditor owed a disputed sum of $480,000.00, is secured.

We have frequently noted that the schedules, not having been entered into the record in the proceedings on this motion, cannot be considered in deciding it. *See In re Aughenbaugh,* 125 F.2d 887, 889 (3d Cir.1942); *Gulph Woods, supra,* at 972; and *In re Nicolet, Inc.,* 80 B.R. 733, 742–43 (Bankr.E.D.Pa.1987). Here, if we eliminate the schedules from consideration, as properly we should, we have no evidence that Hitt or Reiss are even creditors.

Therefore, Cavalier has established, on this record, only that it has a valid secured claim of between $1,200,000.00 and $1,700,000.00. We have already indicated our acceptance of Ms. Reynolds' valuation of the premises at $2,150,000.00. Thus, per this record, an equity cushion of approximately twenty (20%) percent exists in the secured property at present.

The existence of equity of the Debtor in the premises eliminates the applicability of § 362(d)(2)(A) and, perforce, § 362(d)(2). The presence of an equity cushion is also a powerful factor in determining that Cavalier is adequately protected pursuant to § 362(d)(1). It is well-established that an equity cushion alone, even when a debtor is

delinquent in payments due to a secured creditor and the cushion seems certain to erode, may be in itself sufficient to avert a § 362(d) motion. *See Grant Broadcasting, supra,* 71 B.R. at 386; 75 B.R. at 824; *Commonwealth of Pa. State Employees Retirement Fund v. Roane,* 14 B.R. 542, 544–45 (E.D.Pa.1981); *In re Heath,* 79 B.R. 616, 618–20 (Bankr.E.D.Pa.1987); and *In re Curtis,* 9 B.R. 110, 112 (Bankr.E.D.Pa. 1981). *See generally In re McKillips,* 81 B.R. 454, 458 (Bankr.N.D.Ill.1987) (an equity cushion of twenty (20%) percent is generally found to constitute adequate protection *per se* ).

The case most worthy of comparison is *Grant Broadcasting, supra.* There, we found an equity cushion of 27.5 percent present, and then only by accepting the "multiple of cash flow method" of evaluating the volatile value of independent television stations presented by the Debtors' expert witness, which placed the value of the Debtors' assets at about $115.5 million. 71 B.R. at 382. We note that this evidence was opposed by an evaluation of an also-impressive expert called by the secured party, who pegged the value at about $90.5 million. *Id.* Here, we accept the valuation of the Debtor's overwhelmingly superior expert, evaluating the comparatively extremely stable commodity of a historical building. We are therefore much more confident that the evaluation data here is not subject to significant speculation and is more likely to be accurate than the evidence presented in *Grant Broadcasting.*

Also relevant was the proof by the secured party there that the Debtor had defaulted on a significant interest payment due just after the filing date. 71 B.R. at 381. Further, the Debtors' projected loss in 1986 ($20 million) and the increment of actual losses ($36 million) were clearly substantial, and boded ill for the future. *Id.* Here, there is no evidence of any payment default, and the projected losses are relatively modest.

We finally turn to the rather skimpy evidence regarding the Debtor's prospects of reorganization. Our skepticism of such prospects is not nearly so great as it was in

*Grant Broadcasting,* or in *Cann & Saul, supra,* where we also denied a § 362(d) motion filed by a large secured creditor. While the testimony of Mr. Kauffman here was conclusory and vague and hardly specific or decisive on the prospects of the Debtor's plan of reorganization, Cavalier presented nothing to rebut this *prima facie* evidence of the Debtor's feasibility to reorganize. *Compare Gulph Woods, supra,* at 973–74. Parenthetically, we note that, despite our skepticism, the *Grant Broadcasting* debtor has succeeded in presenting a confirmed plan, and the *Cann & Saul* debtor is facing a graceful liquidation after narrowly failing to negotiate a sale of its assets which would have triggered a successful reorganization.

We therefore conclude that not only does the record preclude granting Cavalier's motion under § 362(d)(2), but it is also clear that Cavalier has not met the burdens necessary to succeed under § 362(d)(1). It has not proven the precise extent or the full validity of its own security interest, let alone those of the other creditors it alleges are secured. Evidence of value suggests the existence of an equity cushion. A prospect of a successful reorganization by the Debtor is established on this record. No other "cause" for relief other than lack of adequate protection of its secured claim is alleged, much less proven.

### D. CONCLUSION

In *Grant Broadcasting,* after we denied § 362(d) relief, and in *Cann & Saul, supra,* where we also denied a § 362(d) motion despite the fact that the moving secured creditor was admittedly undersecured, we were, as indicated below, skeptical of the prospects of reorganization. We therefore included, in our dispositive orders, requirements that, *inter alia,* the respective debtors adhere to the rosy projections of turn-arounds presented by them at the respective § 362(d) hearings, and we set specific dates for preparation and filing of plans to avoid an extended delay to the secured party in exercising its rights. 76 B.R. at 489–90; 71 B.R. at 389–90. We are not inclined to do so here for two reasons. The first is that the record presents no

indication that this Debtor cannot and will not be able to successfully reorganize. The second reason is that we are transferring the venue of this case to another court, and we are reluctant to impose deadlines upon the Debtor which may clash with the calendar of that court.

However, we do note that our decision is premised in part on the Debtor's assurance that its plan of reorganization will be prepared and filed by the June 3, 1988, deadline. If not, Cavalier may well renew this motion or file a similar motion in the D.C. bankruptcy court and be able to better prove its case on that occasion. It may also file a competing plan if the exclusivity period expires. However, given this record, we have no choice but to deny Cavalier's motion.

An order consistent with the results reached by us in this Opinion will be entered.

### ORDER

AND NOW, this 20th day of April, 1988, after hearings conducted on February 3, 1988, February 24, 1988, and March 4, 1988, on the Motion of Cavalier Real Estate Inc, (hereinafter referred to as "Cavalier") for Dismissal or for Relief from the Automatic Stay (hereinafter referred to as "the Cavalier Motion") and the Motion of Reiss Construction Company (hereinafter referred to as "Reiss") to Dismiss or for Change of Venue (hereinafter referred to as "the Reiss Motion"), and upon consideration of the parties' Briefs addressing the respective motions, it is hereby ORDERED AND DECREED as follows:

1. The Cavalier Motion is DENIED.

2. The Reiss Motion is GRANTED in part. Venue of this case is transferred, pursuant to 28 U.S.C. § 1412, to the United States Bankruptcy Court for the District of Columbia.

3. The Clerk of this court shall transfer the file of this case to the Clerk of the United States Bankruptcy Court for the District of Columbia immediately upon the expiration of the time for appeal of the disposition set forth in paragraph two of this Order.

4. If it has not already done so, the Debtor shall remit to the Clerk of this court all sums due pursuant to 28 U.S.C. § 1930(a)(6) within seven (7) days of the date of this Order, or this case shall be dismissed in lieu of its transfer pursuant to paragraphs two and three hereof.